JOHN KEVIN ANTOLIK, Plaintiff-Appellee, *v.* HEATHER MUIR HARVEY, Defendant-Appellant

NO. 12461

(FC-D NO. 87-0006)

AUGUST 22, 1988

BURNS, C. J., HEEN AND TANAKA, JJ.

314

OPINION OF THE COURT BY BURNS, C.J.

Defendant Heather Muir Harvey (Wife) appeals the division and distribution of the property and debts part of the family court's August 31, 1987 Amended Divorce Decree. *See Eaton v. Eaton*, 7 Haw. App. ___, 748 P.2d 807 (1987). More specifically, Wife contends that the family court overvalued John Kevin Antolik's (Husband) sole proprietorship chiropractor business as of the date of marriage (DOM) and undervalued it as of the date of the final separation in contemplation of divorce (DOFSICOD). *See Woodworth v. Woodworth*, 7 Haw. App. ___, 740 P.2d 36 (1987). Upon a review of the record, we conclude that the family court's findings that the value of the business as of the DOM was $8,000 and that the value of the business as of the DOFSICOD was $48,000 are both too high. However, we affirm the latter finding.

The DOM is November 17, 1984. The DOFSICOD is November 19, 1986. Commencing March 1984 and at all times during the marriage Husband was a licensed chiropractor doing business as a sole proprietorship named Kalaheo Chiropractic. The parties agree that Wife is entitled to one-half of the increase in value of Kalaheo Chiropractic from DOM to DOFSICOD. The family court

found that the value of the business was $8,000 on the DOM and $48,000 on the DOFSICOD and ordered Husband to pay Wife one-half of the $40,000 increase in value during the marriage.

Husband's expert determined that on October 31, 1984 Kalaheo Chiropractic had an adjusted book value of minus $8,136.96 which included a balance due of $18,675.99 to the First Hawaiian Bank for Husband's Small Business Administration (SBA) loan. Since Kalaheo Chiropractic on October 31, 1984 was not yet profitable, Husband's expert assumed that Husband had to borrow money to live on and concluded that the entire amount due on the SBA loan was Husband's personal debt rather than a debt of Kalaheo Chiropractic. Although Kalaheo Chiropractic's October 31, 1984 balance sheet indicates that Husband's personal draw from the business was then $11,299.16, Husband's expert excluded the entire $18,675.99 debt and arrived at a modified adjusted book value as of October 31, 1984 of $8,000.[1] However, when Husband's expert determined that the adjusted book value of Kalaheo Chiropractic on November 30, 1986 was $48,000, he included the entire remaining balance due on the SBA loan plus the value of the patient charts.[2] The November 30, 1986 balance sheet indicates that the balance due on the SBA loan was then $9,632.06.

Wife's expert determined that Kalaheo Chiropractic had gross receipts of $85,445.54 in 1985 and $147,151.05 in 1986. He esti-

---

[1] We are uncertain why after the $18,675.99 debt was excluded the modified adjusted book value was not $10,539.03. The ingredient numbers are as follows:

| | |
|---|---|
| Assets | $ 8,551.44 |
| Liabilities | (5,592.35) |
| Accounts Receivable | 7,579.94 |
| Adjusted Net Book Value | $10,539.03 |

[2] The ingredient numbers are as follows:

| | |
|---|---|
| Assets | $12,072.95 |
| Liabilities | (18,710.68) |
| Auto | 4,275.00 |
| X-ray | 2,527.36 |
| Equipment | 125.55 |
| Accounts Receivable | 45,525.55 |
| Adjusted net book value | $45,815.73 |
| Value of patient charts | 2,310.00 |
| Total value | $48,125.73 |

mated that Kalaheo Chiropractic's gross receipts in 1987 would be $700 per day for five days per week for fifty weeks or $175,000. Subtracting 40 percent for costs, Wife's expert estimated that Kalaheo Chiropractic's earnings in 1987 would be $105,000. Allowing Husband or his replacement an annual compensation of $54,000, Wife's expert concluded that the earnings of Kalaheo Chiropractic in 1987 would be $51,000. Using a capitalization of future earnings rate of 20 percent, Wife's expert concluded that the value of Kalaheo Chiropractic on December 31, 1986 was $255,000 plus the replacement value of its tangible assets, including its accounts receivable, reduced by the sum of its liabilities.

## I.

Wife contends that the family court's finding that the fair market value of Kalaheo Chiropractic on November 17, 1984 was $8,000 is clearly erroneous because that amount does not include the SBA debt. We agree.

When Kalaheo Chiropractic advanced $11,299.16 to Husband, it reduced its net assets by $11,299.16 and increased Husband's net assets by $11,299.16. In other words, when determining Kalaheo Chiropractic's fair market value, its capital and drawing accounts are disregarded. Therefore, the adjusted net book value of Kalaheo Chiropractic as of the DOM was a minus as follows:

| | |
|---|---|
| Assets | $ 8,551.44 |
| Liabilities | (24,268.34) |
| Accounts Receivable | 7,579.94 |
| Adjusted Net Book Value | ($ 8,136.96) |

## II.

Wife contends that the family court's finding that the value of Kalaheo Chiropractic on DOFSICOD was $48,000 is clearly erroneous because that amount does not include any value for its "goodwill". In other words, Wife contends that the family court erred when it (a) failed to find that Kalaheo Chiropractic owned valuable "goodwill", (b) failed to value the "goodwill", and (c) failed to award to Wife one-half of the value of the "goodwill". We disagree. The evidence in the record allowed the family court to find

in Husband's favor and did not require it to find in Wife's favor on these issues.

In *Linson v. Linson,* 1 Haw. App. 272, 618 P.2d 748 (1980), we held that the phrase "estate of the parties" as it is used in Hawaii Revised Statutes (HRS) § 580-47 means anything of present or prospective value. Usually, anything of prospective value also has a present value. Here, the family court found that the value of Kalaheo Chiropractic as of the DOFSICOD was its adjusted net book value plus the value of its patient charts. Implicitly, the family court found that Kalaheo Chiropractic had no valuable intangible assets and, therefore, no goodwill.

An appellate court is not authorized to reject the trial court's finding of fact which is supported by substantial evidence in the record unless the appellate court has a definite and firm conviction that a mistake has been made. *Yorita v. Okumoto,* 3 Haw. App. 148, 643 P.2d 820 (1982). Since the trial court's finding of fact that the value of Kalaheo Chiropractic as of the DOFSICOD is $48,000 is supported by substantial evidence, the issue on appeal is whether we have a definite and firm conviction that a mistake has been made.

### A.

Goodwill is an attribute of a business. An "income-producing entity, regardless of the nature of the business organization, may have an asset of recognized value beyond the tangible assets of such entity, an intangible asset generally characterized as goodwill." *Taylor v. Taylor,* 222 Neb. 721, ____, 386 N.W.2d 851, 857 (1986). "[G]oodwill is a marketable and transferable asset." *Prahinski v. Prahinski,* 75 Md. App. 113, ____, 540 A.2d 833, 841 (1988).

According to *Prahinski,* there are three judicial views on the question whether the goodwill of the business of a professional that is accumulated during the marriage is marital property. First, the majority view is that such goodwill is a business asset with a determinable value and is marital property. Second, some courts have held that such goodwill is not property and thus cannot be marital property. The third view distinguishes between true goodwill which is a marketable business asset and the goodwill which is dependent on the continued presence of the professional involved.

The former constitutes marital property, while the latter does not. The distinction is explained by the Nebraska Supreme Court as follows:

. [W]here goodwill is a marketable business asset distinct from the personal reputation of a particular individual, as is usually the case with many commercial enterprises, that goodwill has an immediately discernible value as an asset of the business and may be identified as an amount reflected in a sale or transfer of such business. On the other hand, if goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual. Any value which attaches to the entity solely as a result of personal goodwill represents nothing more than probable future earning capacity, which, although relevant in determining alimony, is not a proper consideration in dividing marital property in a dissolution proceeding.

*Taylor v. Taylor,* 222 Neb. at 731, 386 N.W.2d at 858.

We generally agree with the Maryland court that it is essential to recognize "the difference between true goodwill and an individual's reputation, which may be characterized as the ability to obtain future earnings masquerading as goodwill." *Prahinski,* 75 Md. App. at ____, 540 A.2d at 843. Therefore, we adopt the third view espoused by the courts of Arkansas (*Wilson v. Wilson,* 294 Ark. 194, 741 S.W.2d 640 (1987) ); Maryland *(Prahinski, supra);* and Nebraska *(Taylor, supra)* with two reservations: 1) we question whether the word "reputation" adequately describes what must be excluded to arrive at the true goodwill of the business and 2) we question whether the third view adequately provides for situations where the business has the enforceable legal right to the individual's continued services or to prevent the individual from quitting and competing with it. Whether the intangible assets of the business of a professional constitute true goodwill or not should be determined by the trier of fact on a case-by-case basis.

B.

When dividing and distributing the value of the property of the parties in a divorce case, the relevant value is, as a general rule, the

fair market value (FMV) of the parties' interest therein on the relevant date. We define the FMV as being the amount at which an item would change hands from a willing seller to a willing buyer, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

We disagree with the position advanced by Wife, and *In re Marriage of Fleege,* 91 Wash. 2d 324, 588 P.2d 1136 (1979), that the relevant value of a sole professional business is its value to the professional who operates it. Other assets are, as a general rule, valued at their FMV. We know of no valid reason why sole professional businesses should not be valued at their FMVs.

Since our outline in *Fletcher v. Fletcher,* 2 Haw. App. 485, 634 P.2d 1039 (1981), of the various approaches available for determining the FMV of a closely held business is misleading, we will herein attempt correction and clarification. The approaches currently used by accountants when determining the FMV of closely held businesses are divided into two categories and various subcategories as follows:

1. Asset-based approaches
   a. Tangible book value
   b. Adjusted book value
   c. Price-book value ratio
2. Earnings-based approaches
   a. Capitalization of earnings
   b. Capitalization of excess earnings
   c. Discounted cash flow

Kissin and Zulli, *Valuation of a Closely Held Business,* Journal of Accountancy 38 (June 1988). Whatever approach or combination of approaches is used to support an amount, it must always be remembered that (1) in divorce cases the sole object of the exercise is to determine the FMV of the business on the relevant date and (2) absent special circumstances, the value of a sole proprietorship professional business does not include, and must be separated from, the value attributable to the sole professional who operates it.

C.

When Husband's expert valued Kalaheo Chiropractic as of the DOFSICOD, he concluded that it had an adjusted net book value

of $45,815.73. Then he valued the patient charts as if Husband had died and added $2,310.00 to the total. In our view, in the absence of a finding that Husband would not be Kalaheo Chiropractic's competitor, the family court clearly and plainly erred when it valued the patient charts at $2,310.00 and added that amount to the value of Kalaheo Chiropractic.

As an operating business, Kalaheo Chiropractic has no more than two types of willing buyers: investors and licensed chiropractors. The investor is primarily concerned with the certainty of Kalaheo Chiropractic's future net income which depends substantially on Husband's continued presence and production or on the in-fact transfer of the existing patient base to a replacement chiropractor who is no less productive than Husband. The chiropractor is primarily concerned with the infact transfer of Kalaheo Chiropractic's existing patient base from Husband to him or her. If Husband can quit, if Husband can stay but decrease his production, or if the existing patient base of Kalaheo Chiropractic will not transfer to the replacement chiropractor, then the investor's and the chiropractor's primary concerns will not have been satisfied and both will be unwilling to pay anything for goodwill.

Kalaheo Chiropractic cannot require its existing patient base to transfer to a chiropractor who replaces Husband. Moreover, Kalaheo Chiropractic cannot prevent Husband from quitting, from decreasing his production, or from opening a nearby competing business and encouraging its existing patient base to follow him. In other words, Kalaheo Chiropractic has no enforceable legal right to Husband's continued services or to his agreement not to compete if he decides to leave it. If Kalaheo Chiropractic does not own the enforceable legal right to Husband's continued services and to prevent Husband from quitting and competing with it, then the valuation of Kalaheo Chiropractic's goodwill, if any, cannot be based on the assumption that Kalaheo Chiropractic can legally force Husband to continue his services to it and prevent Husband from quitting and competing with it.

However, the fact that during the marriage Husband has enhanced his personal ability to earn current and future income and all other relevant facts should be considered by the family court when it is deciding what just and equitable final orders to enter in the case. *See* HRS § 580-47. There is no relevant difference be-

tween (a) Husband's increased capacity for earning income and (b) the increased capacity for earning income of an employee of a large publicly held corporation who during the marriage has risen from the lowest paying position and little valuable and marketable skills to the highest paying position and a plethora of valuable and marketable skills. We therefore disagree with the position of *Bold v. Bold,* ____ Pa. Super. ____, 542 A.2d 1374, 1379 (1988), that "principles of equity will intervene only when one party has been unjustly enriched by financial contributions rendered which exceed that imposed by law."

Wife's expert testified that for an annual salary of $54,000 Kalaheo Chiropractic could have hired a chiropractor equivalent to Husband to replace Husband and thereafter it would have annually netted $51,000 before taxes. We take judicial notice of the fact that if Kalaheo Chiropractic hired a chiropractor for an annual salary of $54,000 Kalaheo Chiropractic's total out-of-pocket expense for that employee would be significantly more than $54,000. Moreover, there is no evidence on the record with respect to the following material questions of fact: 1) Was there any market for the sale of Kalaheo Chiropractic as a going concern if the sale did not include the enforceable legal right to Husband's continued services or to prevent him from quitting and competing with it? a) Were nonchiropractic investors authorized to own Kalaheo Chirooractic?[3] b) Was there any interest on the part of nonchiropractic investors in owning Kalaheo Chiropractic? c) Was there any interest on the part of other chiropractors in owning Kalaheo Chiropractic? 2) If a chiropractor with Husband's training and experience, who was no less productive than Husband, was hired by Kalaheo Chiropractic at an annual salary of $54,000 to replace Husband, how certain was it that Kalaheo Chiropractic's existing patient base would have in fact transferred to the hired chiropractor? 3) What premium, if any, would an investor or a chiropractor have been willing to pay to purchase Kalaheo Chiropractic notwithstanding the inability to legally force Husband to stay and continue the level of his production and the uncertainty

---

[3] If Kalaheo Chiropractic was a professional corporation, nonchiropractic investors would not be authorized to own any of its shares. HRS § 415A-9(a) (1987 Supp.).

that the existing patient base would in fact transfer to a hired chiropractor?

In the absence of such evidence the family court reasonably rejected the valuation opinion of Wife's expert and, except with respect to the inclusion of a patient chart value, reasonably accepted the valuation opinion of Husband's expert. Consequently, except with respect to the inclusion of a patient chart value, we do not have a definite and firm conviction that a mistake has been made. However, since Husband did not appeal, we affirm the family court's valuation of Kalaheo Chiropractic at DOFSICOD at $48,000.

## CONCLUSION

Accordingly, a portion of Finding of Fact 7 entered on August 19, 1987 shall be amended to read as follows:

> The value of Husband's chiropractic practice as of the date of marriage was minus $8,136.96 and the value as of the date of the final separation in contemplation of divorce was $48,000.00.

A portion of Conclusion of Law 7(j) entered on August 19, 1987 shall be amended to read as follows:

> Husband shall pay the sum of $28,068.48 to Wife as and for her interest in Husband's chiropractic practice.

A portion of the August 31, 1987 Amended Divorce Decree shall be amended to read as follows:

> Plaintiff shall pay the sum of $28,068.48 to Defendant as and for her interest in Plaintiff's chiropractic practice.

We remand this case for amendment of the August 19, 1987 Findings of Fact and Conclusions of Law and the August 31, 1987 Amended Divorce Decree consistent with this opinion. In all other respects we affirm.

*Harold Bronstein (Kurt R. Brosshard* with him on the briefs) for defendant-appellant.

*Randal G.B. Valenciano (Valenciano & Zenger* of counsel) for plaintiff-appellee.