74 P.3d 12

Terri **SPRAGUE**, Individually and as Conservator of the Estate of **William S. Adams** and **Grace P. Adams**, Deceased; **Dana Adams** and **Brian Adams**, Respondents–Appellants/Cross–Appellees,

v.

**CALIFORNIA PACIFIC BANKERS & INSURANCE LTD.**, a Texas corporation aka **California Pacific Casualty**, **Ann N. Nottage**, **Ivan W.C. Kam**, **Louan B. Chandler**, and **Does 1–50**, inclusive, Respondents–Appellees/Cross–Appellees,

and

**Jim Nottage Insurance, Inc.**, Insurance Resources, Inc., Aviation Insurance Associates, Inc., James T. Nottage, Sally Jo Nottage, Allen M. Tokunaga, Petitioners–Appellees/Cross–Appellants.

No. 23541.

Supreme Court of Hawai'i.

July 31, 2003.

Terrance M. Revere, (Myles T. Yamamoto, Honolulu, with him on the writ), for petitioners-appellees/cross-appellants.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ. and Circuit Judge WILSON, assigned by reason of vacancy.

Opinion of the Court by NAKAYAMA, J.

On January 25, 2002, petitioners-appellees/cross-appellants James T. Nottage, Sally Jo Nottage, Allen Tokunaga, Jim Nottage Insurance, Inc. (Nottage Insurance), and Insurance Resources, Inc. (Insurance Resources) [collectively, "the Petitioners"] applied to this court for a writ of certiorari to review the memorandum opinion of the Intermediate Court of Appeals (ICA) in *Sprague v. California Pacific Bankers & Insurance Ltd.*, No. 23541 97 Hawai'i 569, 40 P.3d 971 (Haw.App. Dec. 27, 2001) [hereinafter, "opinion"]. In its opinion, the ICA va-

cated the award of attorneys' fees and costs and affirmed the circuit court's judgment against the Petitioners in all other respects.

In this application for writ of certiorari, the Petitioners allege that the ICA gravely erred in (1) disregarding an issue on appeal based on the Petitioners' failure to comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4),[1] (2) holding that the circuit court did not err in permitting an expert witness to be referred to as "the former Insurance Commissioner for the State of Hawai'i," (3) holding that general damages were assignable, and (4) concluding that the Petitioners were not entitled to judgment as a matter of law. The Petitioners are correct with respect to the third argument, as the ICA erred in holding that "general damages awarded for a negligence cause of action are assignable." The Petitioners' other arguments are without merit. Accordingly, we reverse the $15,300 in general damages awarded for the negligence claim. In all other respects, the ICA's opinion is affirmed.

## I. BACKGROUND

### A. Factual Background

In 1992, Maydwell Millard and Doris Jean Millard [collectively, "the Millards"], doing business as Kona Aviation, sought insurance coverage for a Grumman aircraft from their insurance agent, James Nottage (Nottage), owner of Nottage Insurance. On August 10, 1992, the Millards submitted the first insurance premium installment of $385 to Nottage Insurance.[2] On August 24, 1992, Nottage issued the Millards a certificate of insurance [hereinafter, "Certificate I"], indicating that it was for "aviation insurance" and that Nottage Insurance was the "producer of this insurance." Certificate I, however, misspelled Maydwell Millard's name, and thus, on August 26, 1992, Nottage issued a second certificate of insurance [hereinafter, "Certificate II"], correcting the spelling of Maydwell's name and adding Aviation Insurance Associates (Aviation Insurance) as a "producer." Aviation Insurance was founded by Louan B. Chandler (Chandler) and Ivan W.C. Kam (Kam), who were allegedly working in conjunction with Nottage on the insurance policy. On November 14, 1992, the Millards submitted the second insurance premium installment of $385 to Nottage Insurance.

On November 5, 1992, William Adams and his wife, Grace Adams [collectively, "the Adamses"], rented the Grumman aircraft from the Millards. The Adamses departed from the Kona International Airport and never returned. Neither the Adamses nor the Grumman aircraft were ever found. The Millards notified Nottage about the disappearance of the Adamses and the Grumman aircraft. Nottage suggested that the Millards cancel the remaining portion of their insurance policy and obtain a refund, but the Millards never received a refund.

On March 2, 1993, the Millards received a letter from Nottage, indicating that there was a problem with the insurance allegedly

---

1. HRAP Rule 28(b)(4) provides in relevant part that the appellant's opening brief must contain:

    (4) A concise statement of the points of error set forth in separately numbered paragraphs. Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. Where applicable, each point shall also include the following:
    (A) when the point involves the admission or rejection of evidence, a quotation of the grounds urged for the objection and the full substance of the evidence admitted or rejected;
    (B) when the point involves a jury instruction, a quotation of the instruction, given, refused, or modified, together with the objection urged at the trial;
    (C) when the point involves a finding or conclusion of the court or agency, a quotation of the finding or conclusion urged as error;
    (D) when the point involves a ruling upon the report of a master, a quotation of the objection to the report.

    Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented. Lengthy parts of the transcripts that are material to the points presented may be included in the appendix instead of being quoted in the point.

2. The annual premium for the insurance policy was $1,150.

purchased. The letter provided in relevant part as follows:

It is difficult for me to accept and understand why good faith and trust can be abused. When I placed your insurance on your operations and aircraft, it was with confidence in the underwriter with whom I had dealt without problem for over ten years. It is apparent that this trust and confidence was in error. I have just been notified that Louan Chandler and Ivan Kam, the owners of Aviation Insurance Associates, did not place the insurance you paid for. I have received notice from the company that implicates Mr. Kam by his statements, whereby he cancelled and returned all premiums on policies written through the insurance company he was to have used. Obviously this is in direct contradiction to statements he has made up to and including this morning in conversations with me.

I have contacted the insurance commissioner's office and Mr. Kam. Louan has gone to the Mainland with no forwarding address. I have started a formal investigation with the state. I have written and sent a demand letter to Aviation Insurance Associates for your premiums which we have paid on your behalf.

I am going to Honolulu on March the 2nd, 1993 to discuss this situation with other insurance companies to see what can be done. It might cost more for your insurance through them, but you will be assured of coverage. I understand how you must feel under these circumstances. I too place my insurance through Aviation Insurance Associates. Please call me to discussion [sic] options and coverages in the future. At this point you do not have insurance and I suggest you take appropriate steps to protect your operation.

On July 9, 1993, approximately eight months after the disappearance, the Millards received another letter from Nottage, indicating that they in fact did have insurance. This letter, the subheading reading "surprise, surprise," read as follows:

I was, needless to say, more than a little surprised to find the policy delivered here day before yesterday. I thought you might like a copy.

I have sent in the last policy release to cancel the policy and maybe see if we can get money, some money back. I will keep in touch with any new developments.

In the ensuing months, however, the Millards received information that their insurance policy was not valid because Kam and Chandler cancelled the policies and did not forward the premiums. In a letter from Perry K. Brown of All Claims Services, the Millards were informed that "California Pacific Bankers & Insurance Limited [ (CPBI) ] is a fictitious and non-existent company" and that the Millards were "without any insurance when this loss occurred."

## B. Procedural History

On October 31, 1994, the three Adams children, Terri Sprague, Brian Adams, and Dana Adams [collectively, "the Respondents"], filed a wrongful death suit against the Millards, individually and as owners of Kona Aviation. On August 24, 1995, a stipulated judgment and order was entered into by the Respondents and the Millards, providing, *inter alia*, that: (1) the Respondents be awarded $3 million dollars; (2) the counterclaim be dismissed; (3) the Millards assign all of their legal rights against any of the insurance entities and agents to the Respondents; and (4) the parties bear their own attorneys' fees and costs. Around the same time in August 1995, the Respondents and the Millards entered into an agreement regarding this stipulated judgment and order, which provided, *inter alia*, that: (1) the Respondents shall not record, execute, or levy the $3 million dollar judgment against the Millards; (2) the Respondents agree to defend, hold harmless, and indemnify the Millards from all claims that might be brought by the insurance entities or agents based on the assignment of rights; (3) the Millards cooperate in litigation against the insurance entities and agents; and (4) if the Respondents receive more than $100,000 in conjunction with litigation against the insurance entities or agents, they would pay the Millards $20,000 for the loss of the aircraft and attorneys' fees and costs.

On November 8, 1995, the Respondents commenced the instant case against the Petitioners,[3] alleging (1) negligence, (2) fraud, and (3) bad faith. The Petitioners filed several motions for partial summary judgment regarding, in part, the assignability of the legal rights of the Millards, only one of which was granted, indicating that the Petitioners "were not bound by the amount of the stipulated judgment." The Petitioners also filed a motion in limine to exclude evidence and argument regarding general damages, asserting that general damages were not assignable. The circuit court granted this motion as to Phase One of the bifurcated trial and denied the motion as to Phase Two.[4]

At the conclusion of Phase One of the trial, the jury found the following parties negligent in placing insurance by an unlicenced agent or broker with an unauthorized insurer: Nottage, Nottage Insurance, Chandler, Kam, Aviation Insurance, and CPBI. The jury also found Kam and Aviation Insurance liable for fraud and CPBI liable for bad faith. At the conclusion of Phase Two of the trial, the jury concluded that negligence was a legal cause of damage to the Millards, and assigned the following percentages of fault:

| | |
|---|---|
| Nottage | 15% |
| Nottage Insurance | 15% |
| Chandler | 5% |
| Kam | 25% |
| Aviation Insurance | 20% |
| CPBI | 20% |

For the negligence claim, the jury awarded, cumulatively against all negligent parties, $13,000 in special damages and $15,300 in general damages. In its entirety, the court's judgment reflected the following award of damages:

| | Negligence (special & general) | Fraud (special) | Punitive Damages | Bad Faith |
|---|---|---|---|---|
| Nottage | $4,245 | | | |
| Nottage Insurance | $4,245 | | | |
| Chandler | $1,415 | | | |
| Kam | $7,075 | $13,000 | $250,000 | |
| Aviation Insurance | $5,660 | $13,000 | $100,000 | |
| CPBI | $5,660 | | $250,000 | $13,000 (special) $15,300 (general) |

## C. Appellate History

The Respondents appealed, asserting several errors by the circuit court not pertinent to the instant application for writ of certiorari.[5] The Petitioners cross-appealed, raising seven points of error, four of which are relevant to this application, including that the circuit court erred in: (1) admitting testimo-

3. The Respondents also sued California Pacific Bankers & Insurance Ltd. (CPBI), Ann Nottage, Ivan Kam, and Louan Chandler, who are not parties to this appeal.

4. Phase One pertained to the insurance claims and Phase Two pertained to the injury to the Millards.

5. The Respondents asserted that the circuit court erred when it (1) failed to give various jury instructions, (2) granted Tokunaga's motion for directed verdict at the conclusion of Phase One of the trial, (3) denied the Respondents' motion to amend, (4) awarded attorneys' fees and costs to Tokunaga, costs to Ann Nottage, and costs to Insurance Resources, and (5) denied the Respondents' request for attorneys' fees and costs against Nottage, Nottage Insurance, Tokunaga, and CPBI.

ny from the Respondents' expert witnesses [6] because the testimony included conclusions of law; (2) permitting expert witness Linda Chu Takayama (Takayama) to be referred to as "the former Insurance Commissioner of the State of Hawai'i"; (3) awarding general damages; and (4) determining that the Petitioners were not entitled to summary judgment.

In its opinion, the ICA vacated the circuit court's order awarding attorneys' fees and costs to Nottage, Nottage Insurance, Sally Jo Nottage, Tokunaga, and Insurance Resources. The ICA affirmed the remaining portions of the circuit court's judgment, holding, in relevant part, that: (1) it would not address the first point of error because the Petitioners failed to adhere to HRAP Rule 28(b)(4); (2) the circuit court did not err in permitting Takayama to be referred to as "the former Insurance Commissioner for the State of Hawai'i"; (3) as general damages awarded for a negligence claim were assignable, the circuit court did not err in permitting this award; and (4) the circuit court did not err in concluding that the Petitioners were not entitled to summary judgment. The Petitioners then applied for a writ of certiorari to this court, which this court granted.

## II. STANDARD OF REVIEW

### A. Writ of Certiorari

This court's acceptance or denial of a party's application for certiorari is discretionary. *See* Hawai'i Revised Statutes (HRS) § 602–59(a)(1993). There are two grounds upon which this court may grant an application for writ of certiorari. They are: (1) grave errors of law or fact; or (2) obvious inconsistencies in the ICA's decision with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal. *See* HRS § 602–59(b)(1993).

### B. Compliance with HRAP Rule 28(b)(4)

■ It is within the appellate court's discretion whether to recognize points not presented in accordance with HRAP Rule 28(b)(4). *See* HRAP Rule 28(b)(4).

### C. Admission of Expert Testimony

■ The decision to admit testimony from an expert witness lies within the province of the trial court. *State v. Fukusaku*, 85 Hawai'i 462, 472–73, 946 P.2d 32, 42–43 (1997). Thus, such a decision will not be overturned absent an abuse of discretion. *Id.*

### D. Assignability of General Damages

■ Whether general damages arising out of a negligence claim may be assigned is a question of law that is reviewed de novo. *See Ditto v. McCurdy*, 98 Hawai'i 123, 128, 44 P.3d 274, 279 (2002) (citations omitted) ("[A] question of law . . . is reviewed by this court de novo.").

### E. Motion for Summary Judgment

■ A motion for summary judgment is reviewed de novo. *Guth v. Freeland*, 96 Hawai'i 147, 149, 28 P.3d 982, 984 (2001).

## III. DISCUSSION

### A. The ICA did not gravely err in declining to address the first point on appeal based on HRAP Rule 28(b)(4).

■ The Petitioners argue that the ICA gravely erred when it did not address the first point on appeal regarding the admission of expert testimony allegedly containing conclusions of law. The ICA based its decision not to address this point on HRAP Rule 28(b)(4), which sets forth procedural requirements for the points of error section of the opening brief. The Petitioners allege error because the ICA cited to HRAP Rule 28(b)(4) but then quoted from the discussion section of the Petitioners' opening brief. As such, the Petitioners essentially imply that they complied with HRAP Rule 28(b)(4). Notwithstanding the ICA's citation to the discussion section of the Petitioners' opening brief, the ICA's decision to disregard this point on appeal did not amount to grave error, inasmuch as the Petitioners' points of error section failed to comply with HRAP Rule 28(b)(4).

**6.** The expert witnesses included Ronald Ching, Linda Chu Takayama, and James Krueger.

Pursuant to HRAP Rule 28(b)(4), an opening brief must contain a "points of error" section. If the alleged error involves the admission of evidence, this section must contain (1) a statement of the alleged error, (2) a citation to where in the record the alleged error occurred, (3) a citation to where the appellant brought the error to the attention of the court, and (4) a quotation of the grounds urged for the objection and the full substance of the admitted evidence. An appellate court is given full discretion to disregard issues not set forth in compliance with this rule.

■ In this case, the Petitioners did not comply with HRAP Rule 28(b)(4) by failing to provide a quotation of the grounds urged for the objection in the points of error section of the opening brief. The ICA's conclusion that the Petitioners failed to present this issue properly because they did not quote "the grounds urged for the objection and the full substance of the evidence admitted or rejected" is a correct statement of fact and application of law. *Sprague*, No. 23541, at 36. That the ICA then quoted a portion of the discussion section of the opening brief is inconsequential and does not amount to grave error.

■ It should be noted that the ICA disregarded this point of error but chose to review other points of error that also failed to comply with HRAP Rule 28(b)(4).[7] Under HRAP Rule 28(b)(4), it is entirely within the discretion of an appellate court to do so. It should also be noted that the record on appeal in this case contained twenty-two volumes of court records, twenty-eight transcripts, and numerous exhibits, perhaps emphasizing the need for compliance with HRAP Rule 28(b)(4). Nonetheless, inasmuch as the ICA had the discretion to do so

under HRAP Rule 28(b)(4), it did not gravely err by electing not to address a point of error.

**B. The ICA did not gravely err in concluding that the reference to Takayama as "the former Insurance Commissioner for the State of Hawai'i" was not reversible error.**

■ The Petitioners argue that the ICA gravely erred in finding no error with the reference to Takayama as "the former Insurance Commissioner for the State of Hawai'i,"[8] as this reference was (1) prejudicial, and (2) contrary to the decision in *Create 21 Chuo, Inc. v. Southwest Slopes, Inc.*, 81 Hawai'i 512, 918 P.2d 1168 (App.1996). The Petitioners' arguments are without merit, as the reference to the expert's qualifications (1) was not unduly prejudicial pursuant to Hawai'i Rules of Evidence (HRE) Rule 403, and (2) was not contrary to the ICA's holding in *Create 21 Chuo, Inc.*

As an initial matter, the Petitioners argue that they preserved this issue for appeal, contrary to what the ICA noted. In reviewing this issue, the ICA quoted language from a transcript and then stated that the Petitioners "did not object to this testimony when it was presented in the circuit court." *Sprague*, No. 23541, at 37. The Petitioners faulted this analysis, stating that it "object[ed], both before and during the trial, to what was raised and discussed in point of error 2 of the opening brief. . . ." Point of error 2, however, does not contain accurate pinpoint cites to where in the record the alleged objection was made. Nonetheless, a review of the transcripts reveals that the Respondents referred to Takayama as "the former Insurance Commissioner for the

7. For instance, the ICA reviewed the second point of error—whether the circuit court erred in permitting Takayama to be referred to as "the former Insurance Commissioner for the State of Hawai'i"—notwithstanding the fact that the Petitioners inaccurately cited to where in the record the alleged error occurred and failed to set forth a quotation of the grounds urged for the objection and the full substance of the evidence admitted or rejected. *See* HRAP 28(b)(4)(A). The ICA also reviewed the fourth point of error—whether the Petitioners were entitled to judgment as a

matter of law—notwithstanding the fact that the Petitioners failed to accurately cite to the motions for summary judgment in the record on appeal and failed to provide quotations of the findings or conclusions of the circuit court urged as error. *See* HRAP Rule 28(b)(4)(C).

8. Takayama testified that she was a licensed attorney who served as the Insurance Commissioner of the State of Hawai'i for three years, from December 1991 to February 1994.

State of Hawai'i" on two different occasions and that the Petitioners objected to at least one of these references.[9] Ultimately, whether this issue was properly preserved is irrelevant, as the ICA addressed the merits of this issue. Furthermore, as set forth below, the ICA did not gravely err in ruling that this reference was permissible.

■ Pursuant to HRE Rule 403, "relevant[ ] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." In the commentary to HRE Rule 403, "unfair prejudice" is defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Whether the probative value is outweighed by unfair prejudice entails a balancing test, wholly within the discretion of the trial court.

In this case, the circuit court overruled the objection by the Petitioners regarding the reference to Takayama as "the former Insurance Commissioner for the State of Hawai'i." The circuit court did not err in doing so, inasmuch as there was no evidence that this reference suggested a jury decision on an improper basis. Rather, Takayama was offered as an expert witness and this reference served as the basis for the expert nature of Takayama's testimony. Thus, the ICA did not err in concluding that there was "no rule that prohibit[ed] an expert from disclosing to the jury his or her prior service as a public officer in the field of his or her expertise." *Sprague*, No. 23541, at 37.

The Petitioners' contentions are further without merit in light of the fact that the ICA's opinion is not contrary to its decision in *Create 21 Chuo, Inc.*, as the Petitioners suggest. In *Create 21 Chuo, Inc.*, an attorney was called to testify "as 'an expert in the field of quiet title issues, specifically whether encumbrances affect marketable title.'" *Create 21 Chuo, Inc.*, 81 Hawai'i at 522, 918 P.2d at 1178. In a footnote, the ICA stated that expert and nonexpert witnesses were prohibited from giving opinions as to questions of law. *Id.* at 522 n. 4, 918 P.2d at 1178 n. 4. In its last sentence, the ICA also stated, "Nor can a party appeal to a jury to decide legal questions by presenting the opinions of public officers." *Id.*

The Petitioners focus on this last sentence and contend that the ICA's opinion is contrary to *Create 21 Chuo, Inc.* because the reference appeals to the jury to decide legal questions by presenting the opinion of Takayama, a former public officer. The Petitioners' argument, however, misses the point. The reference to Takayama's former role as an insurance commissioner was to credit her status as an expert witness. *Create 21 Chuo, Inc.* does not prohibit prefacing a question to an expert witness with the expert's qualifications. The Petitioners present no other cogent reasons why Takayama could not be referred to as "the former Insurance Commissioner for the State of Hawai'i." As such, there is no evidence that the ICA gravely erred in concluding that the reference to Takayama was not reversible error.

**C. The ICA gravely erred by holding that "general damages awarded for a negligence cause of action are assignable."**

The Petitioners argue that the ICA gravely erred by holding that general damages

---

**9.** The transcripts of October 21, 1998, AM session, pages 4 16, reveal that the following exchange took place:

    Q: Have you previously served as the Insurance Commissioner for the State of Hawaii?
    A: Yes.
    . . . .
    Q: In your opinion, *as a former Insurance Commissioner for the State of Hawaii*, does that signature at the bottom represent in this case that Mr. Nottage performed simply a clerical function as opposed to an agent actively involved in the placement of this policy?
    Mr. Revere: Objection. Leading. Objection. Rule 403.
    The Court: Overruled. But sustained on foundation as far as scope, within her expertise.

    Mr. Priest: Okay.
    . . . .
    Q: If we can return for just a moment to your reference to unauthorized carrier. Ms. Takayama, *as the Insurance Commissioner, former Insurance Commissioner for the State of Hawaii*, what is your understanding, and could you explain to the jury, what is meant by the term "unauthorized carrier"?
    Mr. Revere: *Objection. Prefacing the question as the "former Insurance Commissioner of the State of Hawaii"*
    The Court: Overruled.
    (Emphases added.)

were assignable because its reliance on *Forgione v. Dennis Pirtle Agency, Inc.,* 701 So.2d 557 (Fla.1997), suggests that it mistakenly focused on whether a negligence claim was assignable, as opposed to whether general damages were assignable. The Petitioners do not contest the assignability of the claim in this case, but contend that the general damages were personal and therefore unassignable. In support of this argument, the Petitioners cite *Austin v. Michiels,* 6 Haw. 595, 595, 1885 WL 5068 (1885) ("[N]o action of which the gist consists of injury to the feelings or in which injury or insult is an aggravation, can be assigned[.]"), and *Cuson v. Maryland Casualty Co.,* 735 F.Supp. 966, 969 (D.Haw.1990) ("Injuries which are purely personal in nature . . . cannot be transferred to another."). The Petitioners are correct that the ultimate issue in this case—whether general damages are personal and unassignable—is not adequately addressed by *Forgione.* The Petitioners are also correct that the award of general damages in this case, consisting of damages to credit, general reputation, and loss of business opportunities, were personal to the Millards and thus not assignable.

1. *In determining assignability, the issue is not only whether the claim is assignable, but also whether the damages arising from such a claim are personal and therefore unassignable.*

The ICA deemed both *Austin* and *Cuson* inapposite, citing to *Forgione* for the proposition that a claim for negligent procurement of insurance may be assigned. In *Forgione,* the Florida Supreme Court compared the non-assignability of a legal malpractice claim, stating,

[T]he duty breached in legal malpractice arises out of a contract for legal services and the resulting injuries are pecuniary injuries to intangible property interests, rather than personal injuries in the strict sense of injuries to the body, feelings, or character of the client. While these aspects might indicate that legal malpractice falls within the class of actions that are assignable . . . legal malpractice is not subject to assignment because "the real basis and substance of the malpractice suit" is a breach of duties within the personal relationship between the attorney and client.

*Id.* at 559 (citations omitted). Distinguishing the personal nature of an attorney-client relationship from the less personal relationship between an insured and an insurance agent, the Florida Supreme Court held that "public policy considerations d[id] not preclude the assignment of an insured's claim for negligence against an insurance agent." *Id.* at 559–60. The *Forgione* court did not directly address, but seemed to imply, the assignability of damages arising from such a claim.

Unlike *Forgione,* which dealt with the assignment of a claim (*i.e.,* insured's claim against an insurance agent for negligence), the issue at hand deals, not with an assignment of a claim,[10] but with the assignment of damages arising from such a claim. In that respect, *Austin* and *Cuson* are germane and persuasive.

In *Austin,* this court was faced with the assignability of a conversion claim where the damages alleged were injury to the commercial credit and good name of the plaintiff, who was driven into bankruptcy. *See Austin,* 6 Haw. at 595. This court recognized the general non-assignability of personal tort claims. *See id.* ("[W]e may say generally that no action of which the gist consists of injury to the feelings or in which injury or insult is an aggravation, can be assigned, voluntarily or by operation of law."). In determining that the claim was not assignable, the court focused on whether the damages were personal, stating,

The assets pass to the assignees. They may bring action for goods taken away or injured. But the bankrupt's commercial credit is not among his assets, and the assignees cannot bring action for an injury to it. The complaint alleges a special damage for which only the person injured can bring action.

10. We do not address the issue of whether a claim for negligent procurement of insurance may be assigned because the Petitioners do not raise this issue in their application for writ of certiorari. Thus, we assume, *arguendo,* that the underlying negligence claim was assignable.

*Id.* Thus, although not precluding the assignability of all claims for conversion, this court sustained the demurrer that the "cause of action d[id] not pass to the assignee." *Id.*

While the holding in *Austin* ultimately focused on the assignment of a claim, the holding in *Cuson* addressed the assignability of damages (as opposed to merely the types of claims). *See Cuson*, 735 F.Supp. at 969–70. In *Cuson*, the United States district court for the District of Hawai'i considered whether punitive damages resulting from a tortious breach of contract were assignable. *Id.* at 970. In resolving this issue, the district court found the reasoning of *Clearwater v. State Farm Mut. Auto. Ins.*, 161 Ariz. 590, 780 P.2d 423 (Ariz.Ct.App.1989), *vacated in part on other grounds*, 164 Ariz. 256, 792 P.2d 719 (1990), persuasive, stating,

> In *Clearwater* [ ], the [Court of Appeals of Arizona] allowed the assignment of punitive damages arising from a bad faith breach of an insurance contract. While recognizing personal tort claims may not be assigned to a third party, the court found nothing in law or public policy which would prohibit the assignment of punitive damages relating to a bad faith breach of an insurance contract. The court emphasized that an insurer should not be permitted to escape liability through assignment where the principal purpose of punitive damages is deterrence.
>
> Although the instant case involves a breach of contract action, as opposed to a bad faith claim, the principles of law pertaining to both claims are analogous and the court finds the reasoning of the [Court of Appeals of Arizona] persuasive. A bad faith action is founded in contract and tort. Similarly, a punitive damages claim arising from a breach of contract action sounds in both contract and tort and is not purely personal in nature.
>
> The purpose of punitive damages in this context is not to compensate the insured for his injuries, but rather to discourage insurance companies from breaching their contracts in a tortious manner.

*Cuson*, 735 F.Supp. at 970–71 (internal citations omitted); *see also Allstate Ins. Co. v. Axsom*, 696 N.E.2d 482, 485 (Ind.Ct.App. 1998) (agreeing with the reasoning of the Arizona appellate court in *Clearwater* ). The district court thus stated, "Clearly, breach of contract actions are assignable, and the court finds that punitive damages claims which have their genesis in that breach of contract are assignable as well." *Cuson*, 735 F.Supp. at 971.

*Austin* and *Cuson* do not involve claims for negligent procurement of insurance. Other jurisdictions, however, recognize, in situations similar to the one at hand, that although a claim may be assignable, an entitlement to damages must still be proven. *See Kobbeman v. Oleson*, 574 N.W.2d 633, 636–37 (S.D.1998) (permitting an assignment of a negligent procurement of insurance claim, despite an agreement not to execute a judgment against the insured-assignor, where concerns about collusion between the injured party and the insured are counterbalanced by the assignee's need to prove damages); *Campione v. Wilson*, 422 Mass. 185, 661 N.E.2d 658, 663 (1996) (same); *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 530–31 (Iowa 1995) (same); *cf. Schlauch v. Hartford Accident and Indemnity Co.*, 146 Cal. App.3d 926, 931, 194 Cal.Rptr. 658, 661 (Cal. Ct.App.1983) (citations omitted) ("Although the insured may assign his cause of action against the insurer for its breach of the duty to settle, he cannot assign the personal tort aspect of that bad faith cause of action because that aspect is not assignable in California.").

We find this reasoning persuasive and hold that, in determining assignability, the issue is not only whether the claim is assignable, but also whether the damages arising from the claim are purely personal in nature. If so, they are unassignable. As applied to general damages, it becomes apparent that most items of general damages are not assignable due to their personal nature.[11] "General damages ... include such items as physical pain and suffering, inconvenience, and loss of enjoyment which cannot

---

11. While most general damages may be unassignable, we recognize that it is the personal nature of the damages, not the label, that ultimately determines assignability.

be measured definitively in monetary terms." *State Farm Mut. Auto. Ins. Co. v. Dacanay*, 87 Hawai'i 136, 138 n. 3, 952 P.2d 893, 896 n. 3 (App.1998) (citation omitted). Inasmuch as general damages, for the most part, are personal and unassignable, the ICA erred by holding that "general damages awarded for a negligence cause of action are assignable."

2. *The general damages awarded in this case were personal and unassignable.*

■ This court has previously addressed whether damages for injury to the commercial credit and general reputation of a business are personal in nature, albeit in the context of assignment of a claim. In *Austin*, this court was faced with whether a claim for conversion was assignable. *See Austin*, 6 Haw. at 595. Although dealing with assignment of a claim, this court focused on the damages requested—in that case, damages for injury to the commercial credit and general reputation of a business that was allegedly forced into bankruptcy.[12] *Id.* Inasmuch as commercial credit, and impliedly the general reputation of a business, were not among the assets of the business, this court held that the damages were personal. *Id.* Consequently, this court held that the complaint alleged damages "for which only the person injured [could] bring action." *Id.*

Subsequent to *Austin*, this court has not addressed whether general damages based on injury to the commercial credit and general reputation of a business may be assigned. The ICA, however, in *McLellan v. Atchison Ins. Agency, Inc.*, 81 Hawai'i 62, 66–68, 912 P.2d 559, 563–65 (App.1996), was faced with the different, yet related issue of whether a covenant not to execute a stipulated judgment eliminated the actual existence of damages, thus precluding an assignee from bringing a claim for negligent procurement

of insurance. The ICA answered in the negative, adopting the "judgment rule," in which the "mere entry of a final judgment against the insured constitutes actual damage to him or her." *Id.* at 67–68, 912 P.2d at 564–65 (citations omitted). Quoting from an annotation, the ICA recognized that "[c]ourts enforcing the judgment rule ... adopt the view that intangible harms are remedial in suits of this kind, and cite to factors as damage to credit and general reputation, loss of business opportunities, and the like, as sufficient in and of themselves to afford a basis for recovery." *Id.* at 67, 912 P.2d at 564 (citing Annotation, *Insured's Payment of Excess Judgment, Or A Portion Thereof, As Prerequisite Of Recovery Against Liability Insurer For Wrongful Failure To Settle Claim Against Insured*, 63 A.L.R.3d 627, 632, 1975 WL 37300 (1975)).

■ In citing to the annotation, the ICA was not holding that, under the judgment rule, an assignee could recover damages for intangible harms such as injury to credit, reputation, and loss of business opportunities. In fact, the passage quoted by the ICA refers only to the judgment rule as applied to an insured's direct claim against an insurer. The annotation later recognizes that

[s]ince a primary purpose of allowing the action absent payment is to repair the damage done the insured's credit rating and financial prospects by the wrongful imposition of a judgment he cannot pay, it is not surprising that recoveries have been most often allowed in cases where the insured is the moving party. Where the action is prosecuted by ... a judgment creditor suing as assignee, the courts have been more cautious, sometimes allowing the action for the same reasons that obtain where the insured brings the suit, but on other occasions ruling that the circum-

---

12. In addressing whether damages to the "good name" of the bankrupt business were assignable, the court in *Austin* was referring to the general reputation of the business due to its being forced into bankruptcy and was not addressing the goodwill of the business. Inasmuch as goodwill is an intangible asset of a business that has a recognized and immediately discernable value, it is distinct from the general reputation of a business. *See Antolik v. Harvey*, 7 Haw.App. 313, 317–18, 761 P.2d 305, 309–09 (1988) (noting the difference between the goodwill of a business and " 'an individual's reputation, which may be characterized as the ability to obtain future earnings masquerading as goodwill.' ") (Citations omitted.). Similarly, we do not address whether the goodwill of a business may be assigned, inasmuch as the damages for reputation that were sought in this case included injury to the reputation of Kona Aviation that was "rendered out of business" and did not include injury to the goodwill of Kona Aviation.

stances giving rise to the representation distinguish the case at bar from those where the insured obtained a recovery in his own name. *It is in these latter class of cases, where the plaintiff sues in a representative capacity, that issues concerning damage arise in their most pressing and perplexing form.*

Annotation, *Liability Insurer's Failure to Settle*, 63 A.L.R.3d at 634 (emphasis added) (citations omitted). Accordingly, *McLellan* stands for the proposition that, under the judgment rule, a covenant not to execute does not per se preclude an assignee from bringing a negligence claim against an insurer. It does not also stand for the proposition that an assignee is entitled to personal damages that the insured would have been entitled to. Indeed, the ICA recognized this in *McLellan* by noting that its holding was limited to the trial court's error in granting a motion for summary judgment and that "the material fact issue of damages remains disputed and unresolved[.]" Accordingly, the general rule established by this court in *Austin*, that damages for injury to commercial credit and reputation are personal and unassignable, remains.

■ As to damages for loss of business opportunities, we know of no jurisdiction that has addressed specifically whether this loss is personal and unassignable. In this jurisdiction, loss of business profits has been treated as economic damages in the context of breach of contract cases. *See Jenkins v. Liberty Newspapers Limited Partnership*, 89 Hawai'i 254, 269, 971 P.2d 1089, 1104 (1999) (noting that business loss, under general libel law, required evidence of "actual economic damage"); *Chung v. Kaonohi Center Co.*, 62 Haw. 594, 604–05, 618 P.2d 283, 290–91 (1980) (recognizing that lost business profits may be awarded in a breach of contract action); *United Truck Rental Equipment Leasing, Inc. v. Kleenco Corp.*, 84 Hawai'i 86, 96, 929 P.2d 99, 109 (App.1996) (defining "lost profits damages" as those "measured by the amount of profit that a plaintiff could prove would have been generated had the plaintiff not been deprived of the use of the property, less the amount of profit actually generated during the deprivation."). Although loss of business profits may not be the same as loss of business opportunities, the economic nature of such damages is similar. We do not think, however, that economic damages, otherwise known as "out-of-pocket" damages, are automatically indicative of non-personal damages. Depending on the circumstances of the case, economic damages may be purely personal in nature, thus precluding assignment. Whether they are personal in this case is dependent upon the evidence presented in support of the award.

■ In this case, similar to *Austin*, the damages sought for injury to the commercial credit and reputation of Kona Aviation were personal and unassignable, inasmuch as the Respondents claimed that the lack of adequate insurance led to the judgment entered against the Millards, and consequently, the inability of the Millards to obtain credit and operate a financially viable business. Similarly, the damages sought for loss of business opportunities were personal and unassignable, inasmuch as there is no indication that they were economically quantifiable and were predicated upon the injury to credit and reputation personally suffered by the Millards. Thus, the circuit court erred by instructing the jury that it could award, and the jury erred by awarding, general damages based on injury to the commercial credit and reputation of Kona Aviation, as well as loss of business opportunities. Accordingly, the $15,300 awarded in general damages must be reversed.

**D. The ICA did not gravely err in concluding that the Petitioners were not entitled to judgment as a matter of law.**

■ The Petitioners argue that they were entitled to summary judgment because (1) the interpretation of the insurance policy is a question of law, (2) the measure of damages for failing to procure insurance is determined by the terms of the insurance policy, and (3) the undisputed facts show that the loss was not covered by the insurance policy. The Petitioners fault the ICA for disagreeing and consequently holding that the presence of disputed facts did not permit

summary judgment. The Petitioners' arguments are without merit.

■■■■ "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Lee v. Corregedore*, 83 Hawai'i 154, 158, 925 P.2d 324, 328 (1996) (citation omitted); *see also* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c).

> A summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is addressed. In effect, the moving party takes the position that he or she is entitled to prevail because his or her opponent has no valid claim for relief or defense to the action. Accordingly, the moving party has the initial burden of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. The moving party may discharge his or her burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his or her opponent. For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless.

*Young v. Planning Comm'n of the County of Kaua'i*, 89 Hawai'i 400, 407, 974 P.2d 40, 47 (1999) (citations omitted) (brackets omitted). "On motion for summary judgment, 'the evidence is viewed in the light most favorable to the non-moving party.'" *Id.* (citation omitted).

In this case, the Petitioners filed several motions, arguing that the court should grant partial summary judgment in favor of the Petitioners because: (1) Doris Millard was not covered by the insurance policy, was not a beneficiary of the insurance policy, and thus could not assign any rights under the insurance policy; (2) the insurance policy did not require that the insurers defend the Millards against liability; (3) because Maydwell Millard was diagnosed with dementia, he lacked the requisite mental capacity to enter into a valid contract to assign his rights to the Respondents; (4) there was no duty to defend the Millards, as the insurance policy did not cover injuries for members of the flight crew and William Adams was piloting the aircraft; (5) Maydwell Millard breached the terms of the insurance policy because he was not a certified flight instructor; and (6) the terms of the insurance policy limited the Respondents to an award of $6,000 for hull coverage.

Viewing the evidence in the light most favorable to the non-moving party—here, the Respondents—there were genuine issues of material fact precluding summary judgment. The Petitioners did not establish that the Respondents had no valid claim that the legal rights of the Millards were assignable or that the insurers had a duty to defend the Millards. Furthermore, there were substantial questions of fact remaining, including: (1) whether Maydwell Millard had the capacity to assign his rights to the Respondents; (2) whether William and Grace Adams were considered members of the flight crew; and (3) whether Maydwell Millard was a certified flight instructor. The Petitioners failed to demonstrate that if the case went to trial there was no competent evidence to support a judgment for the Respondents. As the Petitioners failed to meet this burden, the ICA did not err in concluding that summary judgment was not appropriate.

## IV. CONCLUSION

In light of the foregoing, we reverse the $15,300 general damages award for negligence. In all other respects, the ICA's opinion is affirmed.