153 P.3d 444

**TMJ HAWAII, INC., a Hawai'i corporation, Plaintiff–Appellant,**

v.

**NIPPON TRUST BANK, aka Nihon Shintaku Bank, a Japanese corporation, and Kelley Drye & Warren, a New York general partnership, and Kelley Drye & Warren LLP, a New York limited liability partnership, Defendants–Appellees.**

No. 25588.

Supreme Court of Hawai'i.

Jan. 31, 2007.

Edward J. Bybee, on the briefs, Honolulu, for plaintiff-appellant.

George T. Okamura of George T. Okamura, AAL, ALC, Honolulu, and James N. Duca of Kessner Duca Umebayashi Bain & Matsunaga, on the briefs, Honolulu, for defendant-appellee Nippon Trust Bank, aka Nihon Shintaku Bank.

Robert J. Smolenski of Smolenski & Wooddell, on the briefs, Honolulu, for defendant-appellee Kelley Drye & Warren LLP.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by NAKAYAMA, J.

The corpus of the question presently before this court concerns the validity of a written instrument, executed on September 15, 1994, by which Ishimura Building Co., Ltd. ("Ishimura Building") purported to assign its claims against Nippon Trust Bank ("NTB") and Kelley Drye & Warren ("KDW") to TMJ Hawaii, Inc. ("TMJ").

According to the September 15, 1994 assignment, TMJ filed a complaint in the first circuit court on August 20, 1997. On October 31, 1997, KDW removed the action to the United States District Court for the District of Hawai'i ("district court"). Based upon the following recitation of facts, TMJ claimed that (1) NTB breached its contractual, professional, and fiduciary duties to Ishimura Building, and (2) KDW actively participated in perpetrating a fraud against Ishimura Building, in connection with the sale of two commercial real estate properties previously owned by Ishimura Building.

The district court, concerned about the validity of the September 15, 1994 assignment, certified to this court the question whether Hawai'i law recognizes the assignability of the tort claims of professional malpractice, breach of fiduciary duty, and fraud claims. For the following reasons, we now answer the certified question in the affirmative.

## I. BACKGROUND

Trial has not yet commenced, and no evidence has been received. Accordingly, the following factual background relies primarily upon the information certified to this court by the district court, as well as the allegations contained within TMJ's amended complaint.

Ishimura Building was the owner of the Coconut Plaza Hotel in Honolulu, Hawai'i and the Kailua Professional Center in Kailua, Hawai'i. In May 1991, Ishimura Building retained NTB as its agent and advisor to aid in the sale of the two commercial properties. The agreement between Ishimura Building and NTB required NTB to sell the properties at the highest price and under the best terms possible. NTB subsequently retained the services of KDW to advise NTB with respect to the sale of Ishimura Building's properties.

### A. The Coconut Plaza Hotel

KDW selected Windward Professional Realty ("WPR") to broker the sale of the Coconut Plaza Hotel. The record indicates that Ishimura Building authorized the execution of an agreement by which WPR would serve as Ishimura Building's exclusive representative and would receive $400,000 in compensation. However, TMJ alleges that NTB falsely represented to Ishimura Building that it was necessary to retain WPR as its exclusive sales representative because WPR had located a buyer for the Coconut Plaza Hotel. TMJ further alleges that NTB and KDW failed to disclose to Ishimura Building that the purpose for inducing Ishimura Building to authorize the exclusive representation agreement was that NTB and KDW were to receive $350,000 of the $400,000 commission from WPR. On August 1, 1991, the sale of the Coconut Plaza Hotel closed, and WPR was paid the $400,000 commission.

### B. The Kailua Professional Center

With respect to the sale of the Kailua Professional Center, NTB and KDW negotiated with JVIH, Inc. ("JVIH") to purchase the property for $9,350,000. TMJ alleges that, following agreement of the aforesaid purchase price, NTB and KDW restructured the deal such that JVIH would pay $8,500,000 to Ishimura Building, and the remaining $850,000 would be dispersed as follows: (1) $200,000 to NTB; (2) $150,000 to KDW; and (3) $500,000 to Wise Board, Ltd., a Hong Kong corporation controlled by NTB and/or KDW. TMJ claims that NTB falsely represented to Ishimura Building that $8,500,000 was the highest price that could be obtained for the Kailua Professional Center. TMJ also claims that, had it not sold the Kailua Professional Center to JVIH for $8,500,000, it could have sold the property for its actual fair market value, or $10,500,000.

## II. DISCUSSION

### A. The Parties' Arguments

As previously mentioned, the question certified to this court is whether Hawai'i law

recognizes the assignability of the tort claims for professional malpractice, breach of fiduciary duty, and fraud.

### 1. *TMJ's opening brief*

TMJ first argues that Hawai'i Revised Statutes ("HRS") § 634–1 supports the assignability of claims, generally. HRS § 634–1 (1993) provides, in relevant part, that "[t]he assignee of any non-negotiable chose in action, assigned in writing, may maintain thereon in the assignee's own name any action which, but for the assignment, might be maintained by the assignor[.]" TMJ contends that HRS § 634–1 is an enabling statute, the intent of which is to enable an assignee to pursue an assignor's claim. For support, TMJ refers us to *Hanu v. Yamaichi*, 30 Haw. 959, 1929 WL 3031 (1929), which commented on HRS § 634–1 (then codified as Revised Laws of Hawai'i ("RLH") § 2361 (1925)).

TMJ also argues that the general rule is that claims are assignable, and that a claim's ability to survive the death of the claimant is the test for determining assignability. To that end, TMJ refers us to *Alameda v. Spenser*, 34 Haw. 667 (1938), which states, in relevant part, the following:

"All things in action which survive and pass to the personal representatives of a decedent creditor as assets, or continue as liabilities against the representatives of a deceased debtor, are, in general, thus assignable; all of which do not thus survive, but which die with the person of the creditor or of the debtor, are not assignable. The first of these classes, according to the doctrine prevailing throughout the United States, includes all claims arising from contract express or implied, with certain well-defined exceptions; and those arising from torts to real or personal property, and from frauds, deceits, and other wrongs, whereby an estate, real or personal, is injured, diminished, or damaged. The second class embraces all torts to the person or character, where the injury and damage are confined to the body and the feelings; and also those contracts, often implied, the breach of which produces only *direct* injury and damage, bodily or mental, to the person, such as promises to marry, injuries done by the want of skill of a medical practitioner, contrary to his implied undertaking, and the like; and also those contracts, *so long as they are executory,* which stipulate solely for the special *personal* services, skill, or knowledge of a contracting party."

*Id.* at 674 (emphases in original) (citation omitted). Applying the survival test, TMJ avers that "if Ishimura Building was an individual and died, Ishimura Building's fraud claims would survive."

TMJ further points out that although the certified question incorporates professional malpractice claims, the "First Amended Complaint" did not "specifically use the words professional malpractice" and it did not allege an attorney-client relationship existed between Ishimura Building and KDW. Nevertheless, TMJ argues that it could have pursued a legal malpractice claim, had one been assigned. TMJ acknowledges that some jurisdictions do not permit the assignment of legal malpractice claims where a highly personal and confidential relationship existed between the attorney and the assigning client. However, TMJ distinguishes those cases by asserting that "there was no highly personal or confidential attorney-client relationship between Ishimura Building and Defendants Kelley Drye." [1]

Based upon the foregoing arguments, TMJ requests that this court answer the certified question in the affirmative.

### 2. *NTB's and KDW's answering brief*

NTB and KDW counter that the doctrines of champerty and maintenance mitigate

---

1. TMJ mistakenly presumes that the district court's reference to a professional malpractice claim stems from a perceived attorney/client relationship between Ishimura Building and KDW. TMJ fails to realize that the professional malpractice portion of the certified question originates from Ishimura Building's relationship with NTB. Indeed, when summarizing the claims stated in TMJ's complaint, the district court expressly stated that "Plaintiff alleges that *Defendant Nippon* breached its contractual, *professional,* and fiduciary duties to Ishimura Building and perpetrated a fraud against it." (Emphases added.) Thus, the question whether legal malpractice claims are assignable has not been certified to this court, and we need not address it here.

against concluding that Ishimura Building's claims were assignable. They cite several cases stating that champertous agreements are contrary to public policy. NTB and KDW thus appear to assert that permitting TMJ, "an assetless, dissolved corporation which claims to be an assignee of Ishimura Building," to pursue Ishimura Building's claims is contrary to public policy.

Addressing TMJ's assertion that the assignability issue is resolved by HRS § 634–1, NTB and KDW argue that the statute's effect is merely procedural. They contend that the purpose of HRS § 634–1 was to supersede the common law rule requiring an assignee to pursue an assigned cause of action in the name of the assignor. NTB and KDW point out that *Hanu* interprets HRS § 634–1 as merely amending a common law procedural rule restricting the name under which an assignable claim could be pursued, as opposed to substantively altering the law to permit the assignment of an otherwise unassignable claim.

NTB and KDW next contend that Hawai'i law contemplates limits on the assignability of claims. On that score, they cite *Austin v. Michiels*, 6 Haw. 595, 1885 WL 5068 (1885), in which this court held that a tort action for damages caused to commercial credit and business reputation was not "of an assignable nature." *Id.* at 595–96. NTB and KDW also cite *Cuson v. Maryland Cas. Co.*, 735 F.Supp. 966 (D.Haw.1990), which held that a claim for punitive damages based upon an alleged breach of contract was assignable insofar as "a punitive damages claim arising from a breach of contract action sounds in both contract and tort and is not purely personal in nature." *Id.* at 970–71. In addition, NTB and KDW refute TMJ's reference to *Alameda*, asserting that (1) the *Alameda* court was not faced with the question whether the claim was assignable, and (2) although the *Alameda* court alluded to the survival test, it did not purport to adopt that rule as this jurisdiction's test for determining assignability.

Finally, NTB and KDW present this court with the following three approaches utilized by other jurisdictions when analyzing the assignability of claims: (1) the survival test;

(2) the characterization test; and (3) the facts and circumstances test. They request that this court adopt the facts and circumstances test insofar as it would place this court "in the company of other courts which have held that valuable court time and resources . . . should not be accorded to traffickers in claims."

## B.  HRS § 634–1

■ Our initial task is to determine whether HRS § 634–1 disposes of the present matter. HRS § 634–1 provides, in its entirety, as follows:

> [§ 634–1] **Assignee; nonnegotiable chose.** The assignee of any non-negotiable chose in action, assigned in writing, may maintain thereon in the assignee's own name any action which, but for the assignment, might be maintained by the assignor; subject, however, to all equities and setoffs existing in favor of the party liable against the assignor and which existed at the time of the assignment or at any time thereafter until notice thereof was given to the party liable, except as otherwise provided.

Reviewing the plain language of the statute, *see In re Wai'ola O Moloka'i*, 103 Hawai'i 401, 422, 83 P.3d 664, 685 (2004) ("In construing statutes, we have recognized that our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.") (Citations omitted.) (Block quote formatting omitted.), the primary principle extracted therefrom appears to be no more, and no less, than what is expressly stated—that an assignee of a chose in action may pursue it in the assignee's own name. The statute does not purport to authorize the assignment of choses in action that were previously unassignable, and there is no justification for such a conclusion here. Indeed, that interpretation is confirmed by *Hanu*.

In *Hanu*, Almos Hanu ("Hanu") assigned his chose in action against Y. Yamaichi ("Yamaichi") to A.F. Tavares ("Tavares") by written instrument dated July 20, 1926. *Hanu*, 30 Haw. at 960. At trial, Tavares moved to amend his declaration by (1) changing the

title to read "A. F. Tavares, Trustee for Almos Hanu, Plaintiff, vs. Y. Yamaichi, Defendant," and (2) "adding a paragraph setting forth that 'on the 20th day of July, 1926, Almos Hanu appointed A.F. Tavares, trustee, to prosecute the above entitled action and that the said proceedings be conducted in his name." *Id.* The circuit court denied Tavares' motion, stating that:

> it would not be 'right' to the defendant to permit a substitution of parties plaintiff at the stage to which the trial had then progressed—it then being too late to examine the jurors as to their bias or prejudice toward the assignee or thereafter to challenge them for cause or peremptorily.

*Id.* at 960–61. The circuit court then directed the jury to return a verdict in favor of Yamaichi on the grounds that no right of action survived that could be prosecuted by Tavares. *Id.* at 961.

On appeal, this court was presented with the following two points of error: "(1) Did the trial court err in denying plaintiff's motion to amend? and (2) Did said court err in granting the defendant's motion for a directed verdict?" *Id.*

With respect to the first issue, this court held that the denial of Tavares' motion to amend was within the discretion of the trial court and was not improperly denied. *Id.* at 962–63. We noted that RLH § 2361[2] conferred upon an assignee of a chose in action the right to pursue that chose in action in the assignee's own name. *Id.* at 962. We further stated that an assignee could also pursue the action in the name of the assignor. *Id.* at 963. We thus concluded that the circuit court did not err by denying Tavares' motion to amend insofar as (1) the action was maintainable in the name of either the assignee or the assignor, and (2) the assignee was not a necessary party to the case. *Id.*

Considering the second point of error, this court held that the trial court erred by directing a verdict for Yamaichi because Ta-

vares, as assignee, could have maintained the action in the name of the assignor, Hanu, as originally filed. *Id.* at 964. Accordingly, this court remanded the matter for a new trial. *Id.*

*Hanu's* analysis of RLH § 2361, standing alone, is not conclusive insofar as it does not expressly address whether RLH § 2361 affects the assignability of claims. However, in *Hanu*, we also commented that neither party contested the assignability of the chose in action:

> It was not urged that a right of action in trespass for assault and battery is not assignable in Hawaii. The question apparently was not considered in the circuit court. Both parties and the court assumed that the assignment accomplished a transfer of plaintiff's interest to Tavares. The question was not raised in this court by the bill of exceptions or the original briefs and appeared for the first time upon questions propounded by the court to counsel. In the view we take its decision is not necessary to a determination of the case.....
>
> *If the chose in action was not assignable, the motion to amend was properly overruled. If the chose in action was assignable, the motion was still, within the discretion of the court, not improperly overruled.*

*Id.* at 961–62 (emphasis added). NTB and KDW argue that if RLH § 2361 had the effect of making assignable all previously unassignable claims, there would have been no reason for this court to raise the issue of the assignability of rights of action in trespass for assault and battery. We agree. In light of the afore-quoted language, *Hanu* indicates that RLH § 2361 was meant to permit an assignee of a chose in action to maintain the action in the assignee's own name, *only to the extent that the chose in action is among those that are of an assignable nature.* That conclusion comports with other decisions by this court holding that

---

2. RLH § 2361 (1925) provides as follows:

**Sec. 2361. Assignee; nonnegotiable chose.** The assignee of any nonnegotiable chose in action, assigned in writing, may maintain thereon in his own name any action which, but for the assignment, might be maintained by the assignor; subject, however, to all equities and set-offs existing in favor of the party liable against the assignor and which existed at the time of the assignment or at any time thereafter until notice thereof was given to the party liable.

certain choses in action are unassignable. *See, e.g., Austin,* 6 Haw. at 596 ("[T]he bankrupt's commercial credit is not among his assets, and the assignees cannot bring action for an injury to it. The complaint alleges a special damage for which only the person injured can bring action."); *Sprague v. California Pac. Bankers & Ins. Ltd.,* 102 Hawai'i 189, 201, 74 P.3d 12, 24 (2003) ("In this case, similar to *Austin,* the damages sought for injury to the commercial credit and reputation of Kona Aviation were personal and unassignable.... Similarly, the damages sought for loss of business opportunities were personal and unassignable....").

Therefore, HRS § 634–1 does not dispose of the present matter, and the question remains whether professional malpractice claims, breach of fiduciary duty claims, and fraud claims fall within that class of claims that are assignable.

## C. Champerty and Maintenance

■ We next consider NTB's and KDW's argument that the common law doctrines of champerty and maintenance preclude the assignment of the claims presently asserted by TMJ.

In *Van Gieson v. Magoon,* 20 Haw. 146, 1910 WL 1368 (1910), Justice Perry defined the terms "champerty" and "maintenance" as follows:

Champerty and maintenance have been variously defined in the books, ancient as well as modern. Courts and text writers seem to have found some difficulty in stating precisely what they consisted of in England. Perhaps the following definition comes as near as possible to stating the generally accepted view on the subject. Champerty (campum partire, to divide the land) is "a bargain with a plaintiff or defendant in a suit for a portion of the land or other matter sued for in case of a successful termination of the suit which the champertor undertakes to carry on at his own expense."—Bouvier. Maintenance is "a malicious or at least officious interference in a suit in which the offender has no interest, to assist one of the parties to it against the other with money or advice, to

prosecute or defend the action without any authority of law."—Bouvier.

*Id.* at 155 (Perry, J., concurring). Justice Perry explained that, historically, contracts involving champerty and maintenance were viewed as instigating unworthy litigation and contrary to public policy:

In olden England such contracts were deemed to be contrary to sound public policy because it was believed that if they were permitted the result would be to encourage and facilitate the stirring up of unworthy litigation. Various considerations contributed to this view. In the first place, judges as a rule were more or less corrupt and the administration of justice was in disrepute. It was believed that powerful lords could and did control the judges and influence judicial decisions in their favor irrespective of the merits of controversies. The position of attorneys, too, was materially different then from what it is now. They were not supposed to receive any compensation as such for their services but merely an honorarium or gift at the option of the client. Attorneys could not demand or expect to receive pay as a matter of right. They were not permitted to make any contract whatsoever with their clients. It was deemed to be for the best interests of the community that the powerful lords owning large landed estates should continue in the ownership and possession of such estates and that others should not acquire title to any part of such property. The discouragement of litigation against the lords was for that as well as for other reasons regarded as desirable. The assignment of choses in action was also prohibited.

*Id.* at 156–57.

However, this court has repeatedly rejected blind adherence to rules crafted to meet anachronistic societal demands and has expressed skepticism about the continued potency of the doctrines of champerty and maintenance. *See Henrique v. Paris,* 10 Haw. 408, 413 (1896) ("The old rule is a provision of the feudal law, and grew out of a state of society which does not exist in these Islands. There is not now and here the necessity that there was in England in the Middle

Ages for laws against champerty and maintenance to prevent the stirring up of suits for purposes of oppression[.]"); *Van Gieson,* 20 Haw. at 149 ("The conditions of society under which the law of maintenance and champerty originated no longer exist.").

Moreover, the modern trend now favors the assignability of causes of action. *See Osuna v. Albertson,* 134 Cal.App.3d 71, 83, 184 Cal.Rptr. 338, 345 (Cal.Ct.App.1982) ("It suffices to point out that the tendency of modern jurisprudence strongly favors the assignability and the survivability of things in action.") (Citation omitted.) (Emphasis removed.); *Brown v. Guar. Ins. Co.,* 155 Cal. App.2d 679, 695, 319 P.2d 69, 79 (1958) ("The modern trend in favor of assignability dispels any remaining doubts concerning the transferability of the insured's claim."); *McKenna v. Oliver,* —— P.3d ——, ——, 2006 WL 2564636, *2 (Colo.Ct.App. Sept.7, 2006) ("Generally, Colorado law favors the assignability of claims."); *Conrad Bros. v. John Deere Ins. Co.,* 640 N.W.2d 231, 236 (Iowa 2001) ("[T]he law now generally favors the assignability of choses in action[.]"); *Lemley v. Pizzica,* 36 Pa. D. & C.2d 327, 330 (Pa.Ct. Com.Pl.1964) ("The trend of judicial decisions as to the assignability of certain causes of action is to enlarge, rather than to restrict the causes that may be assigned.") (Citations omitted.); *Wisconsin Bankers Ass'n (Inc.) v. Mut. Savs. & Loan Ass'n of Wisconsin,* 96 Wis.2d 438, 291 N.W.2d 869, 877 (1980) (recognizing a "common law trend favoring the assignability of choses in action").

Accordingly, we conclude that the common law doctrines of champerty and maintenance are not impediments to the assignability of the claims at issue in this case.

## D. Hawai'i Law Prohibits the Assignment of "Personal" Tort Claims.

When reviewing the assignability of claims, this court has repeatedly adhered to the principle that "personal" claims for relief are unassignable.

### 1. *Austin v. Michiels*

The earliest reported opinion in this jurisdiction addressing the assignability of claims is this court's decision in *Austin.* The plaintiff, an assignee in bankruptcy, filed an action alleging that the defendant forcibly entered the bankrupt's premises and removed property owned by the bankrupt thereby causing loss and damage resulting in injury to the bankrupt's commercial credit and reputation. 6 Haw. at 595. The defendant demurred, arguing that the cause of action was not assignable. *Id.* This court first noted that the Bankruptcy Act of 1884 authorized assignees in bankruptcy to "bring suit for the goods, or the value, of the bankrupt, wrongfully taken." *Id.* However, we further explained that the Bankruptcy Act of 1884 did not permit assignees in bankruptcy to take claims that were not assignable. *Id.* We explained:

> An action for assault or for seduction could not pass to executors or assigns, and we may say generally that *no action of which the gist consists of injury to the feelings or in which injury or insult is an aggravation, can be assigned,* voluntarily or by operation of law.

*Id.* (emphasis added). We thus concluded that a claim for injury to commercial credit was unassignable:

> The assets pass to the assignees. They may bring action for goods taken away or injured. But the bankrupt's commercial credit is not among his assets, and the assignees cannot bring action for an injury to it. The complaint alleges a special damage for which only the person injured can bring action.

*Id.* at 596.

### 2. *Sprague v. California Pacific Bankers & Insurance, Ltd.*

In *Sprague,* Maydwell Millard and Doris Jean Millard ("the Millards"), doing business as Kona Aviation, rented a Grumman aircraft to William and Grace Adams ("the Adamses"), who departed from Kona International Airport and never returned. 102 Hawai'i at 192, 74 P.3d at 15. The Millards were thereafter informed that, despite having arranged and paid for an insurance policy, their aircraft was uninsured when the loss occurred. *Id.* at 193, 74 P.3d at 16. The Adamses' children, Terri Sprague, Brian Adams, and Dana Adams ("Respondents"), subsequently

filed a wrongful death action against the Millards individually and as owners of Kona Aviation. *Id.* A stipulated judgment and order was agreed upon by the Respondents and the Millards, stating that: "(1) the Respondents be awarded $3 million dollars; (2) the counterclaim be dismissed; (3) the Millards assign all of their legal rights against any of the insurance entities and agents to the Respondents; and (4) the parties bear their own attorneys' fees and costs." *Id.* The Respondents and the Millards further agreed that:

(1) the Respondents shall not record, execute, or levy the $3 million dollar judgment against the Millards; (2) the Respondents agree to defend, hold harmless, and indemnify the Millards from all claims that might be brought by the insurance entities or agents based on the assignment of rights; (3) the Millards cooperate in litigation against the insurance entities and agents; and (4) if the Respondents receive more than $100,000 in conjunction with litigation against the insurance entities or agents, they would pay the Millards $20,000 for the loss of the aircraft and attorneys' fees and costs.

*Id.*

Respondents then filed a claim against James T. Nottage, Sally Jo Nottage, Allen Tokunaga, Jim Nottage Insurance, Inc., and Insurance Resources, Inc. (collectively referred to as "Petitioners"), as well as California Pacific Bankers & Insurance Ltd., Ann Nottage, Ivan Kam, Louan Chandler, and Aviation Insurance Associates, alleging negligence, fraud, and bad faith. *Id.* at 194, 74 P.3d at 17. Following trial, the jury awarded Respondents $13,000 in special damages and $15,300 in general damages. *Id.* On appeal, the ICA, *inter alia,* affirmed that portion of the circuit court's judgment awarding general damages, holding, in relevant part, that, "as general damages awarded for a negligence claim were assignable, the circuit court did not err in permitting this award[.]" *Id.* at 195, 74 P.3d at 18.

This court, on writ of certiorari, reviewed, *inter alia,* the petitioners' claim that the ICA gravely erred by upholding an assignment of general damages. *Id.* at 198, 74 P.3d at 21.

The petitioners did not challenge the assignability of the underlying claim, *id.* at 198 n. 10, 74 P.3d at 21 n. 10, but asserted that general damages were personal and thus unassignable. *Id.* at 198, 74 P.3d at 21.

We agreed, holding that,

in determining assignability, the issue is not only whether the claim is assignable, but also whether the damages arising from the claim are purely personal in nature. If so, they are unassignable. As applied to general damages, it becomes apparent that most items of general damages are not assignable due to their personal nature. "General damages ... include such items as physical pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." *State Farm Mut. Auto. Ins. Co. v. Dacanay,* 87 Hawai'i 136, 138 n. 3, 952 P.2d 893, 896 n. 3 (App.1998) (citation omitted). Inasmuch as general damages, for the most part, are personal and unassignable, the ICA erred by holding that "general damages awarded for a negligence cause of action are assignable."

*Id.* at 199–200, 74 P.3d at 22–23 (footnote omitted) (ellipses in original).

We emphasized, however, that "it is the *personal nature* of the damages, not the label, that ultimately determines assignability." *Id.* at 199 n. 11, 74 P.3d at 22 n. 11 (emphasis added). Applying the rule, we concluded that the general damages were personal, and thus unassignable:

Although loss of business profits may not be the same as loss of business opportunities, the economic nature of such damages is similar. We do not think, however, that economic damages, otherwise known as "out-of-pocket" damages, are automatically indicative of non-personal damages. Depending on the circumstances of the case, economic damages may be purely personal in nature, thus precluding assignment. Whether they are personal in this case is dependent upon the evidence presented in support of the award.

In this case, similar to *Austin,* the damages sought for injury to the commercial credit and reputation of Kona Aviation

were personal and unassignable, inasmuch as the Respondents claimed that the lack of adequate insurance led to the judgment entered against the Millards, and consequently, the inability of the Millards to obtain credit and operate a financially viable business. Similarly, the damages sought for loss of business opportunities were personal and unassignable, inasmuch as there is no indication that they were economically quantifiable and were predicated upon the injury to credit and reputation personally suffered by the Millards. Thus the circuit court erred by instructing the jury that it could award, and the jury erred by awarding, general damages based on injury to the commercial credit and reputation of Kona Aviation, as well as loss of business opportunities. Accordingly, the $15,300 awarded in general damages must be reversed.

*Id.* at 201, 74 P.3d at 24.

3. *In Hawai'i, the personal/property dichotomy, not survivability, governs whether a cause of action is assignable.*

■ The general rule gleaned from these cases is that tort claims that are "personal" in nature are not assignable. As mentioned, this court has described such "personal" tort claims as actions "of which the gist consists of injury to the feelings or in which injury or insult is an aggravation[.]" *Austin,* 6 Haw. at 595. *See also* 4 J. Pomeroy, Equity Jurisprudence § 1275, at 793 (5th ed.1941) (describing as unassignable that class of torts "to the person or character, where the injury and damage are confined to the body and the feelings[ ]") (footnote omitted). These "personal" tort claims are distinguished from "non-personal" or "property" tort claims— *i.e.,* those that arise out of an injury to the claimant's property or estate. *See* Pomeroy, *supra,* at 792–93 (describing assignable causes of action as "those arising from torts to real or personal property, and from frauds, deceits, and other wrongs, whereby an estate, real or personal, or injured, diminished, or damaged[ ]") (footnote omitted); 6A C.J.S. § 39, at 646–47 (1975) ("Generally, a right of action in tort, which does not apply to the person strictly, but involves directly or

indirectly a right of property or injury to one's property or estate, is assignable, especially when the assignee has acquired title to the property. It has been said that a distinction is observed between those causes of action for wrongs which affect the person strictly and all others.") (Footnote omitted.).

■ Because this court has, on one occasion, endorsed the common law rule that equated assignability with survivability, we now take a moment to clarify that assignability and survivability are no longer interchangeable in this jurisdiction.

In *Alameda,* this court was confronted with the issue whether Frank Alameda ("Alameda"), as administrator of the estate of Awili Shaw ("Shaw"), could file a claim for arrears of a police pension in the amount of $1,303.90 due and unpaid to Shaw during her lifetime. *Id.* at 668. The defendants, the board of trustees of the police pension fund of the County of Maui ("the board"), refused to pay Alameda's claim on the grounds that the claim was not one that survived Shaw's death and, thus, was not payable to the administrator of her estate. *Id.*

On appeal, this court concluded as follows:

*We find nothing in the authorities justifying a conclusion that the general rule that a cause of action created by statute does not survive unless there is a statute specifically providing for its survival and that a cause of action which is unassignable does not survive should not be applied in this case.*

We accordingly hold that the cause of action, which it is admitted [Shaw] had in her lifetime, did not survive. The cause of action not having survived, her administrator cannot maintain an action to recover it. A judgment in favor of the board of trustees of said pension fund may be entered.

*Id.* at 674–75 (emphases added).

In so concluding, this court relied on several authoritative works, including 3 Pomeroy's Eq. Jur. § 1275, which stated as follows:

"All things in action which survive and pass to the personal representatives of a decedent creditor as assets, or continue as liabilities against the representatives of a

deceased debtor, are, in general, thus assignable; all of which do not thus survive, but which die with the person of the creditor or of the debtor, are not assignable. The first of these classes, according to the doctrine prevailing throughout the United States, includes all claims arising from contract express or implied, with certain well-defined exceptions; and those arising from torts to real or personal property, and from frauds, deceits, and other wrongs, whereby an estate, real or personal, is injured, diminished, or damaged. The second class embraces all torts to the person or character, where the injury and damage are confined to the body and the feelings; and also those contracts, often implied, the breach of which produces only *direct* injury and damage, bodily or mental, to the person, such as promises to marry, injuries done by the want of skill of a medical practitioner, contrary to his implied undertaking, and the like; and also those contracts, *so long as they are executory*, which stipulate solely for the special *personal* services, skill, or knowledge of a contracting party."

*Alameda*, 34 Haw. at 674 (emphases in original) (citing 3 Pomeroy's Eq. Jur. § 1275).

Subsequent to the *Alameda* decision, the legislature enacted HRS § 663-7, *see* 1955 Haw. Sess. L. Act 205, § 2, at 185, which states as follows:

§ 663-7 **Survival of cause of action.** A cause of action arising out of a wrongful act, neglect, or default, except a cause of action for defamation or malicious prosecution, shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person and any damages recovered shall form part of the estate of the deceased.

HRS § 663-7 (1993).

By enacting the foregoing survival statute, the legislature has extended the class of causes of action that survive beyond the class contemplated at common law and described by this court in *Alameda*. There is no indication, however, that the legislature intended a concomitant expansion of the class of causes of action that are assignable. Indeed the legislature expressly stated that the purpose of the enactment of a survival statute was to remedy the "untold hardship and injustice" arising out of the "archaic" common law doctrine terminating a tort right of action upon the death of the injured party. Stand. Comm. Rep. No. 581, in 1955 House Journal, at 773. The legislature focused entirely on survivability and made no mention of assignability. Thus, the survivability and assignability analyses appear to have been legislatively uncoupled.

While some jurisdictions have concluded that the enactment of a broad survival statute governs assignability,[3] others view such legislation as disconnecting the tests of survival and assignability.[4] The latter interpreta-

---

3. *See Davenport v. State Farm Mut. Auto. Ins. Co.*, 81 Nev. 361, 404 P.2d 10, 12 (1965) ("[I]t is now quite generally accepted that the assignability of the right to sue in tort for personal injuries is governed by the test of survivorship—i.e., if the right of action survives the death of the injured person, that right is assignable. The right to sue in tort for persona injuries does survive in Nevada, NRS 41.100(1), and therefore is assignable.") (Internal citations omitted.) (Footnote omitted.); *Ferrer v. Guevara*, 192 S.W.3d 39, 43 (Tex.Ct.App. 2005) ("On the premise that assignability depended on survivability, the passage of the Texas Survival Statute meant that personal injury claims became assignable."); *Nichols v. United States Fid. & Guar. Co.*, 37 Wis.2d 238, 155 N.W.2d 104, 107 (1967) ("Since the accepted test of assignability of a cause of action in Wisconsin is whether it would survive the death of a party, it is necessary to look to our survival statute[.]") (Footnote omitted.); *Peterson v. Brown*, 457 N.W.2d 745, 748 (Minn.Ct.App.1990) ("Minneso-

ta's rule on assignability conforms to the general practice. Assignability is determined by reference to Minn.Stat. § 573.01 (1990) which governs survival[.]").

4. *See Can Do, Inc. Pension & Profit Sharing Plan & Successor Plans v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 867 (Tenn.1996) ("Although a chose in action must survive to be assignable, not every action that survives is assignable. For example, claims for personal injuries survive, pursuant to Tenn.Code Ann. § 20-5-102 (1994), but generally are not assignable. In modern times, the common law test of determining the issue of assignability solely by whether the claim survives the assignor's death seems outdated and misplaced. Other state courts have experienced difficulty in applying the survival test and have approached this issue by considering factors such as public policy considerations, which vary depending upon the particular type

tion is more consistent with Hawai'i law. To wit, in *Sprague*, this court expressly reaffirmed *Austin's* holding that injury to commercial credit is personal and unassignable. In so doing, this court did not mention either survivability or HRS § 663–7. Pursuant to

of action under examination.'') (Paragraph formatting omitted.); *Forsthove v. Hardware Dealers Mut. Fire Ins. Co.*, 416 S.W.2d 208, 217 (Mo.Ct. App.1967) ("We reject the rule urged by Hardware Dealers that whether a cause of action for personal injury is assignable depends solely upon whether it survives and adopt the rule that such causes of action may not be assigned prior to judgment for reasons of public policy. We think the case law as given to us by the Supreme Court of this state dictates this course, a course we would willingly follow even though there was no such case law. We think the reasons for the applicability of such a public policy are as fundamental and as necessary today as in the days of the origin of this rule. We do not think economic or social changes since its origin make the reasons for this humane rule anachronistic.''); *Goldfarb v. Reicher*, 112 N.J.L. 413, 171 A. 149, 150 (1934) ("It is a firmly established rule that a right of action for personal injuries cannot be made the subject of assignment before judgment, in the absence of a statutory provision to the contrary. Except when otherwise provided by statute, nothing is assignable, either at law or in equity, that does not directly or indirectly involve a right to property. In other jurisdictions the rule is that survival is the test of assignability of rights of action ex delicto. But the rule is otherwise in this state. While the . . . act relating to executors and the administration of intestates' estates . . . vests in the executor or administrator an action against the trespasser for any trespass done to the person or property of his testator or intestate, our court of the last resort has declared, and it is now settled law, that this provision did not abrogate the rule that such causes of action are not assignable before judgment.'') (Internal citations omitted.); *Joos v. Drillock*, 127 Mich.App. 99, 338 N.W.2d 736, 738 (1983) (noting that Michigan's survival statute states that "[a]ll actions and claims survive death[,]" but adopting the rule that "survivability is not the only test," and concluding that legal malpractice claims were unassignable based on public policy grounds) (some brackets in original and some added); *Notarian v. Plantation AMC Jeep, Inc.*, 567 So.2d 1034, 1035 (Fla.Ct.App.1990) ("[W]e are not unmindful that the assignability of a cause of action is the rule rather than the exception, and that many causes of action based on tort survive the tort victim's death. The assignability of a tort claim, however, is not controlled by its survivability. Florida's courts adhere to the common-law prohibition barring the assignment of personal injury claims.") (Internal quotation marks omitted.) (Internal citations omitted.); *S. Farm Bureau Cas. Ins. Co. v. Wright Oil Co.*, 248 Ark. 803, 454 S.W.2d 69, 72 (1970) ("We have no hesitancy in joining those courts which hold that a survival statute does not confer the power of assignment upon the holder of an unliquidated tort claim for personal injuries.''); *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 945 P.2d 317, 327 (Ct.App.1996) ("[T]he Arizona courts detached the rule of non-assignability of personal injury claims from the survivability standard and supported it on independent policy grounds. In *Harleysville Mutual Insurance Co. v. Lea*, 2 Ariz.App. 538, 541, 410 P.2d 495, 498 (1966), we explained that the non-assignability rule prevents 'unscrupulous people' from 'traffic[king] in law suits for pain and suffering.' ") (Some brackets added and some in original.); *Town & Country Bank of Springfield v. Country Mut. Ins. Co.*, 121 Ill.App.3d 216, 76 Ill.Dec. 724, 459 N.E.2d 639, 640 (1984) ("Illinois law has established that a cause of action for personal injuries may survive by virtue of the Survival Act, but it is nevertheless not assignable, on public policy grounds. Two reasons were given for this principle: (1) A litigious person could harass and annoy others if allowed to purchase claims for pain and suffering and pursue the claims in court as assignees; and (2) all assignments are void unless the assignor has either actually or potentially the thing which he attempts to assign.") (Internal citations omitted.); *Travelers Indem. Co. v. Rader*, 152 W.Va. 699, 166 S.E.2d 157, 161 (1969) (stating that "the legislative enactment of the provisions of Code, 55–7–5 and 6, as amended, which pertain to the survivability in various situations of a wrongful death action and the recovery of hospital, medical and funeral expenses therein, and Code 55–7–8 and 8a, as amended, which provide for the survival and revival of certain actions which did not survive at common law . . . relate only to the survivability and/or revivability of certain specific claims and in no way alter or amend the common law with respect to the assignability of such claims[ ]"); *Wagener v. McDonald*, 509 N.W.2d 188, 191 (Minn.Ct.App. 1993) ("Today, it seems anachronistic to resolve the issue of the assignability of a legal malpractice claim by deciding whether such a claim would survive the client's death. * * * As is sometimes the case with the common law, the rule has outlived the reason for its creation. 'The customs, beliefs, or needs of a primitive time establish a rule or formula. In the course of the centuries the custom, belief or necessity disappears, but the rule remains.' Where such is the case, this Court has been willing to 'reexamine the basis of the rule.' Assignment should be permitted or prohibited based on the effect it will likely have on modern society and the legal system in particular. Thus, we consider issues of public policy rather than the statutory survival test to determine whether legal malpractice claims are assignable.") (Some block quote and paragraph formatting omitted.) (Internal citation omitted.).

HRS § 663–7, the cause of action in *Sprague*, alleging injury to commercial credit, would have survived the death of the claimant, insofar as it (1) arose out of a wrongful act, and (2) did not assert a claim for defamation or malicious prosecution. Thus, this court's reaffirmation of the validity of *Austin's* conclusion—that a claim alleging an injury to commercial credit is unassignable—implies that survivability is a non-factor in the assignability analysis.

Given the foregoing, we now explicitly abandon reference to survivability when analyzing the assignability of a claim for relief and adhere to the principle described by *Austin* and *Sprague*—*i.e.*, the personal/property dichotomy.

### E.  TMJ's Claims Are Not "Personal."

Having concluded that the proper inquiry in this jurisdiction is whether the cause of action alleges a personal injury or an injury to property, our subsequent obligation is to analyze the specific claims presented in the case at bar. To that end, we have previously focused our attention on the injury alleged. *See Sprague*, 102 Hawai'i at 200, 74 P.3d at 23 ("[D]ealing with assignment of a claim, this court focused on the damages requested—in that case, *damages for injury* to the commercial credit and general reputation of a business that was allegedly forced into bankruptcy.") (Footnote omitted.) (Emphasis added.). That focus recognizes the truism that a claim's title (*i.e.*, "professional malpractice," "breach of fiduciary

duty," "fraud," etc.) is not dispositive. Indeed, a "fraud" may harm either person or property. Claims for "professional malpractice" and "breach of fiduciary duty" share the same chameleonic quality.

Here, the two-count complaint asserts non-personal injuries. The first count alleges that "Ishimura Building was damaged by the payment of the $400,000 brokerage fee and suffered additional damages to the extent the Coconut Plaza Hotel was sold for less than its fair market value." The second count alleges that "Ishimura Building was induced to sell the Kailua Professional Center for $2,000,000.00 less than its appraised and fair market value and has been damaged by said amount." These allegations consist of direct and quantifiable economic injuries[5] to the estate or property of Ishimura Building, as opposed to physical, mental, or reputational harm. Given the non-personal nature of the injuries alleged, we are compelled to conclude that the professional malpractice, breach of fiduciary duty, and fraud claims presented in the present case are assignable.

We are not unsympathetic to the view that public policy may nevertheless preclude such assignments insofar as it would arguably facilitate the merchandising of non-personal tort claims. However, questions regarding the wisdom of permitting such assignments are more appropriately directed to the legislature, which is better positioned to balance the policy considerations and potential consequences that will flow from such a decision.[6]

---

5.  However, an allegation of economic harm is not always indicative of non-personal injury. *See Sprague*, 102 Hawai'i at 201, 74 P.3d at 24 ("We do not think, however, that economic damages, otherwise known as 'out-of-pocket' damages, are automatically indicative of non-personal damages. Depending on the circumstances of the case, economic damages may be purely personal in nature, thus precluding assignment.").

6.  We have, in the past, exhibited such restraint when faced with policy decisions of similar magnitudes. *See State v. Aiwohi*, 109 Hawai'i 115, 129, 123 P.3d 1210, 1224 (2005) ("Although we recognize that there may be significant policy implications and social ramifications surrounding the present issue, it is well established that the legislature is best suited to assess such considerations."); *State Farm Mut. Auto. Ins. Co. v. Gepaya*, 103 Hawai'i 142, 152, 80 P.3d 321, 331

(2003) (stating that "such policy decisions are expressly within the constitutional purview of the legislature"); *State v. Jardine*, 101 Hawai'i 3, 10, 61 P.3d 514, 521 (2002) (observing that "[w]hile there may be sound policy reasons to allow a choice of evils justification defense for the protection of unborn children, the adoption of such a public policy is best left to the state Legislature"); *In Re Water Use Permit Applications*, 94 Hawai'i 97, 192, 9 P.3d 409, 504 (2000) (stating that "the 'how' or the public policy making function was properly reserved for the legislature"); *Lee v. Corregedore*, 83 Hawai'i 154, 171, 925 P.2d 324, 341 (1996) (stating that broad policy decisions are "best left to the branch of government vested with the authority and fact finding ability to make such broad public policy decisions, namely the Hawai'i Legislature").

## III. CONCLUSION

Based upon the foregoing analysis, we (1) hold that TMJ's causes of action for professional malpractice, breach of fiduciary duty, and fraud are of an assignable nature, and (2) answer the certified question in the affirmative.

