The INDIANAPOLIS–MARION COUNTY PUBLIC LIBRARY, Appellant–Plaintiff,

v.

CHARLIER CLARK & LINARD, PC, Thornton Tomasetti Engineers, and Joseph G. Burns, Appellees–Defendants.

No. 06A05–0906–CV–327.

Court of Appeals of Indiana.

June 28, 2010.

---

Gregory F. Hahn, Robert S. Daniels, Charles R. Whybrew, Kevin M. Quinn, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorneys for Appellant.

Gerard L. Gregerson, Karl L. Mulvaney, Brad A. Wilt, Bingham McHale LLP, Indianapolis, IN, Timothy R. Moorhead, Lana Larson Dean, Wright, Fulford, Moorhead, & Brown, P.A., Orlando, FL, Attorneys for Appellee Thornton Tomasetti Engineers.

## OPINION

CRONE, Judge.

### Case Summary

The Indianapolis–Marion County Public Library ("the Library") appeals the trial court's grant of summary judgment in favor of Thornton Tomasetti Engineers ("TTE") on three cross-claims against TTE that were assigned to the Library by Woollen Molzan and Partners, Inc. ("WMP"), pursuant to a settlement agreement between the Library and WMP. We affirm in part, reverse in part, and remand for further proceedings.

### Issues

I. Did the trial court err in granting summary judgment in favor of TTE on the cross-claim for common law indemnity?

II. Did the trial court err in granting summary judgment in favor of TTE on the cross-claim for contractual indemnity?

III. Did the trial court err in granting summary judgment in favor of TTE on the cross-claim for breach of professional standard of care?

### Facts and Procedural History[1]

The designated evidence in favor of the Library, as the party opposing TTE's summary judgment motion, indicates that the Library is a municipal corporation located in Indianapolis. In the 1990s, the Library approved a plan for an extensive renovation and expansion of the Central Library Facility in Indianapolis. The project, which totaled over $100 million, involved the renovation of an edifice commonly known as the Cret Building; the demolition of a multi-story annex; the construction of an underground parking garage, which serves as the foundation for a new six-story tower; the construction of an atrium that connects the tower to the Cret Building; and the construction of a new auditorium.

In 1998, the Library contracted with WMP, an Indiana corporation, to serve as the architect of record for the project. In

---

1. We heard oral argument on June 1, 2010, in Indianapolis. We thank counsel for their presentations.

1999, WMP and TTE, an international engineering firm headquartered in New York, executed an architect/consultant agreement, pursuant to which TTE served as the structural engineer of record for the project. WMP executed additional agreements with other consultants. TTE issued final stamped structural design drawings in 2002. Joseph G. Burns, a managing principal of TTE, affixed his engineer's seal to the drawings. Thereafter, the Library awarded contracts to perform work on the project.

Construction on the parking garage began in March 2003. In February 2004, Library personnel discovered major voids in concrete beams and columns in the underground parking garage. The Library retained a forensic engineering firm, whose investigation revealed significant design and construction defects in the parking garage. Concerned about the structural integrity of the garage, which was to serve as the foundation for the new tower, the Library suspended construction in May 2004. Additional investigation revealed additional design and construction flaws and indicated that substantial repairs would be required. The Library terminated its contract with WMP in April 2006. The construction delays, forensic testing, and repairs allegedly resulted in damages to the Library totaling over $43 million as of December 31, 2007.

On August 27, 2004, the Library filed a complaint against several entities, including WMP and TTE. On June 2, 2006, the Library filed a first amended complaint that asserted four claims against WMP: (1) breach of architect contract (design phase); (2) breach of architect contract (construction administration); (3) negligent performance of architectural services; and (4) violations of statutory and regulatory duties of architects. The Library's first amended complaint also asserted five counts against TTE: (5) third-party beneficiary claim for TTE's breach of its agreement with WMP (design phase); (6) third-party beneficiary claim for TTE's breach of its agreement with WMP (contract administration); (7) violations of statutory and regulatory duties of professional engineers; (8) negligent performance of engineering services; and (9) fraud and constructive fraud.[2]

TTE filed a cross-claim against WMP. On November 14, 2005, WMP filed a reply to TTE's cross-claim and asserted the following three cross-claims[3] against TTE:

*COUNT I (BREACH OF PROFESSIONAL STANDARD OF CARE)*

. . . .

2. In the first amended complaint, the Library also named as defendants both Burns and Charlier Clark & Linard, PC ("CCL"), an Indianapolis engineering firm retained by WMP, neither of which is involved in this appeal. In 2008, the trial court granted summary judgment for Burns, CCL, and TTE on the Library's negligence claims against them. On appeal, another panel of this Court affirmed the trial court, holding that "the economic loss doctrine precludes the Library from recovering under these circumstances." *Indianapolis–Marion County Pub. Library v. Charlier Clark & Linard, P.C.*, 900 N.E.2d 801, 804 (Ind.Ct.App.2009), *trans. granted.* Our supreme court has accepted transfer and held

oral argument but has not yet issued an opinion in that case. According to the Library, the trial court also granted summary judgment in favor of TTE on the Library's third-party beneficiary claims. Appellant's Reply Br. at 5 n. 3. At oral argument, the Library's counsel stated that the Library did not appeal that ruling.

3. Although WMP called them counterclaims, we refer to them as cross-claims because WMP and TTE are co-defendants. *See* Ind. Trial Rule 9(G) ("A pleading may state as a cross-claim any claim by one party against a co-party.").

11. [WMP] performed its services under its various Agreements with the Library for the Project in compliance with all applicable statutory and regulatory duties.

12. [WMP] performed its services under its various Agreements with the Library for the Project in [ ] compliance with all applicable contractual and common-law standards of professional care.

13. The Library has alleged that TTE failed to adequately perform its services under its Agreement with [WMP] in compliance with applicable statutory, regulatory, contractual and common-law standards of professional care, although the extent of TTE's breaches [is] not presently fully known to [WMP].

14. Because of TTE's various alleged breaches of its professional standard of care owed to [WMP], [WMP] has been exposed to potential liability for damages to the Library in an amount equal to the damage resulting from TTE's various breaches of its statutory, contractual and common-law standards of professional care.

15. As a direct and proximate result, [WMP] has been damaged in an amount to be proven at trial.

COUNT II (CONTRACTUAL INDEM-
NITY)

. . . .

17. The Library has brought claims against [WMP] for damages resulting from TTE's alleged breach of its Agreement with [WMP], TTE's failure to comply with statutory, regulatory, contractual and common-law duties of professional care.

18. The Agreement between [WMP] and TTE requires that TTE defend, indemnify and hold [WMP] harmless from and against the claims asserted by the Library against [WMP].

19. Based upon the Agreement between [WMP] and TTE, [WMP] demand[s] and is entitled to have TTE defend and indemnify [WMP] for the Library's claims and alleged damages asserted against [WMP].

20. Because TTE refuses to defend and indemnify [WMP], [WMP] has been damaged in an amount to be proven at trial.

COUNT III (COMMON LAW INDEM-
NITY)

. . . .

22. To the extent that [WMP] is liable to the Library, [WMP's] liability is wholly the result of TTE's breaches of applicable statutory, regulatory, contractual and common law duties, for which [WMP] is without fault.

23. Under such circumstances [WMP] is entitled to, and hereby demands, defense and indemnity from TTE under the common law of the State of Indiana.

24. Because TTE refuses to defend and indemnify [WMP], [WMP] has been damaged in an amount to be proven at trial.

Appellant's App. at 2211–12.[4]

On August 23, 2006, the Library and WMP executed a settlement and release agreement ("Agreement") that reads in pertinent part as follows:

4. We appreciate that the Library has included a complete table of contents in each volume of its fifteen-volume appendix. We note, however, that the table does not include a brief description of the dozens of exhibits submitted on summary judgment, which would have facilitated our review.

2. *Tender of Error and Omissions Policy Proceeds.* In order to resolve certain claims asserted in the Construction Litigation and all claims asserted in the Copyright Litigation [related to the Library's alleged unauthorized use of WMP's design documents after terminating WMP's contract], by and between the Library and [WMP], [WMP's insurer] shall tender to the Library the sum of Five Hundred Eighty Thousand Dollars ($580,000.00) ... plus an additional amount as set forth in Paragraph 3 of this Agreement [i.e., "the balance of any and all policy limits remaining" on WMP's insurance policy "after payment and settlement of" an unrelated claim against WMP].

. . . .

5. *Payment of Certain Unpaid Payment Applications.* The Library shall process and pay to [WMP] the sum of One Hundred and Thirty Thousand Dollars ($130,000.00), plus an additional amount equal to one-half (1/2) of [the payment mentioned in paragraph 3], which sum represents an amount sufficient to satisfy any and all unpaid payment applications submitted by [WMP] to the Library for services unrelated to services required to repair the allegedly defective work of [WMP] and/or its consultants.

6. *Assignment of Claims Against Consultants.* [WMP] shall assign to the Library all claims, rights, causes of action [ ] and damages, arising out of contract or tort, which [WMP] may have against any and all [WMP] Consultants, including, but not limited to, TTE. . . . The Library is hereby granted the sole and exclusive right to pursue the claims of [WMP] against [WMP] Consultants, whether in the Library's own name or in the name of [WMP], for the benefit of and at the expense of the Library. Notwithstanding the foregoing, the Library

shall not assume any contractual obligations of [WMP], including, without limitation, any contractual obligations to any [WMP] Consultant or other third party.

. . . .

11. *Limited Indemnification of [WMP].* The Library shall hold harmless and indemnify [WMP] solely against any contractual claims asserted by TTE for additional services fees related to the Project. Notwithstanding the foregoing, the Library shall not hold harmless or indemnify [WMP] for any other claim or purpose including, without limitation, any other contractual breach claims, tort claims, copyright actions, defamation action, and/or any other cause of action not expressly covered by the Library's limited indemnification described in this Paragraph 11.

12. *Limited Release of Claims by the Library.* FOR AND IN CONSIDERATION of the execution of this Agreement, the payment of [the insurance proceeds mentioned in paragraphs 2 and 3], and other good and valuable consideration, the sufficiency of which are hereby acknowledged, the Library ... hereby release[s], acquit[s] and forever discharge[s] only [WMP] ... from any and all claims, actions, causes of action, suits, damages, demands, debts, sums of money, accounts, breach of covenants, breach of contracts, controversies, breach of agreements, breach of promises, rights, liabilities, costs, judgments, delays, hindrances to the performance of work under the Architect Contract, whether known or unknown, which the Library has against [WMP] ..., relating solely: (i) to services provided by [WMP] on the Project other than services provided by [WMP] Consultants; and (ii) to the Copyright Litigation. Nothing contained in this Agreement

shall constitute a waiver or release of the rights of the Library to: (i) pursue any and all claims against [WMP] for services provided by [WMP] Consultants or any other party for which [WMP] is responsible; (ii) pursue any and all claims against the [WMP] Consultants, including ... TTE ... for errors, omissions, breaches, and other wrongful conduct of the same relating to the Project; or (iii) enforce the terms of this Agreement.

13. *Release of Claims by [WMP]*. FOR AND IN CONSIDERATION of the execution of this Agreement, the payment described in Paragraph 5 of this Agreement, and other good and valuable consideration, the sufficiency of which [is] hereby acknowledged, [WMP] ... hereby release[s], acquit[s] and forever discharge[s] the Library ... from, without limitation, any and all claims, actions, causes of action, suits, damages, demands, debts, sums of money, accounts, breach of covenants, breach of contracts, controversies, breach of agreements, breach of promises, rights, liabilities, costs, judgments, delays, hindrances to the performance of work under the Architect Contract, whether known or unknown, which [WMP] has against the Library, relating to, without limitation, the Architect Contract, Parking Garage, Project, Construction Litigation, and Copyright Litigation. Nothing contained in this Agreement shall constitute a waiver or release of the rights of [WMP] to enforce the terms of this Agreement.

14. *Dismissal of Copyright Litigation*. [WMP] and the Library shall stipulate to the dismissal of any and all claims or counterclaims asserted in the Copyright Litigation with prejudice within three (3) business days of the execution of this Agreement.

15. *Dismissal of Construction Litigation*. [WMP] agrees to dismiss any and all counterclaims against the Library asserted in the Construction Litigation with prejudice within three (3) days of the execution of this Agreement.

16. *Covenant Not to Execute Judgment*. In the event the Library obtains a judgment ... against [WMP] arising directly from the errors and omissions of the [WMP] Consultants and not from [WMP] itself, the Library agrees not to execute on the judgment against [WMP]. In the event the Library obtains such a judgment, the Library, with the cooperation of [WMP], shall pursue any collection efforts directly against the [WMP] Consultants.

17. *Further Assurances*. Each of the parties hereby agree[s] to execute and deliver, and to take any further actions, as may be reasonable and appropriate in order to carry out the purpose of this Agreement.

 . . . .

20. *No Admission of Liability*. The execution of this Agreement is not an admission on the part of any of the Parties of any liability, fault or obligation whatsoever. This Agreement is a compromise of disputed liability covering all the claims asserted, or which could have been asserted, in the Lawsuit, or in any action, claim, litigation, arbitration, complaint, or regulatory or administrative proceeding.

 . . . .

25. *Governing Law*. The laws of the State of Indiana shall govern this Agreement ...

*Id.* at 527–32.[5] WMP understood—and the Library's counsel stated at the sum-

---

5. Pursuant to the Agreement, WMP also as-
signed to the Library a cross-claim that it had

mary judgment hearing—that WMP's payment to the Library was solely for any wrongdoing committed by WMP and not for any wrongdoing committed by any of WMP's consultants. *Id.* at 2127 (deposition of Larry O'Connor); Appellee's App. at 31 (transcript of summary judgment hearing).

In October 2006, the trial court granted the Library's motion to be substituted for WMP as the real party in interest regarding the cross-claims between WMP and TTE. The Library never moved to amend the cross-claims. In June 2008, TTE filed a motion for partial summary judgment against the Library as to the cross-claims. The Library filed a response, in which it raised for the first time an implied contractual indemnity theory of recovery. In its reply to the Library's response, TTE noted that neither WMP nor the Library had pled an implied contractual indemnity claim.

After a hearing, on November 12, 2008, the trial court entered an order that reads in pertinent part as follows:

[The Library], by way of assignment, is not entitled to directly pursue its own damages, it is only entitled to recover the damages suffered by WMP because that is all WMP could assign.

1. *[The Library] cannot recover for contractual indemnity.*

WMP brought a cause of action against TTE for contractual indemnity. [The Library] now attempts to pursue that claim as assignee.

There is no indemnity provision in the contract that runs to WMP from TTE. Without such a provision, there can be no cause of action for contractual indemnity against TTE. The only mention of

filed against CCL. The trial court subsequently granted summary judgment in favor of CCL on WMP's cross-claim and certified its order

indemnity in the Contract between WMP and TTE is contained in to the Contract [sic] which ambiguously states in pertinent part that:

"Client (WMP) shall hold harmless and indemnify [TTE]." There is no language in the provision that can be construed as placing an obligation on TTE to indemnify WMP.

Under the language of this contractual provision, there exists no right to contractual indemnity for WMP. Because [the Library] stands in the shoes of WMP, WMP had no cause of action for contractual indemnity to assign to [the Library] and thus, such a cause of action is not sustainable by [the Library]. Therefore, TTE is entitled to summary judgment on Count II of WMP's [cross-claim].

2. *[The Library] cannot recover for common law indemnity.*

. . . .

Upon review of [the Library's] First Amended Complaint, the causes of action against WMP contain allegations of WMP's own wrongful acts and do not allege any derivative or constructive liability; thus, any judgment against WMP would be based upon its own wrongful acts. [The Library], as assignee, attempts to recover for indemnity against TTE when [the Library's] own complaint against WMP seeks judgment for WMP's own acts. Thus, upon the allegations as they stand in the complaint, any judgment against WMP would be for its own acts, . . . and thus, a claim for common law indemnity is not cognizable. For this reason TTE is entitled to summary judgment on WMP's count for common law indemnity.

for interlocutory appeal. On October 23, 2009, our motions panel denied the Library's motion to accept jurisdiction over the appeal.

Further, [the Library] is not entitled to common law indemnity assigned from WMP because WMP will never incur a loss. . . .

[The Library] stands in the shoes of WMP. TTE would only be required to indemnify WMP when and only when WMP incurs a loss. In the allegations of the [cross-claim], WMP does not allege that it has incurred any present damage, but that it may incur liability to [the Library]. . . .

WMP has settled with [the Library]. There are no new claims asserted by [the Library], as assignee, by which [the Library] attempt[s] to recover any damages incurred by WMP. Even if there were such claims by [the Library], as assignee, it is undisputed that in the settlement, WMP did not pay the underlying claim or tender any payment in settlement of the underlying claim. According to the terms of the settlement agreement, WMP's insurance carrier paid a certain amount of money. WMP itself paid no monies, but instead received monies for outstanding payment applications related to the Central Library Project. In exchange for payment by the carrie[r], [the Library] gave WMP a limited release of the claims that [the Library] had against WMP . . . from those claims relating solely (i) to services provided by WMP on the Project other than services provided by WMP consultants and (ii) to the Copyright Litigation.

As to the payment of any judgment, [the Library] executed a covenant not to execute on any judgment obtained against WMP. Consequently, WMP will never incur a loss by paying a judgment in this cause which would trigger a right to indemnity. As a result, [the Library], as assignee, will never be entitled to indemnity from TTE, and thus summary judgment should be granted as to Count II on this ground as well.

3. *[The Library] Cannot Recover Under Count I Because It is Actually a Claim for Indemnity.*

In its [cross-claim], WMP alleges a cause of action for "breach of standard of care." After making allegations that WMP performed its services on the Project in full compliance and with the requisite care, WMP alleges the following facts in Paragraphs 13 and 14:

13. The Library has alleged that TTE failed to adequately perform its services under its Agreement with [WMP] in compliance with applicable statutory, regulatory, contractual and common-law standards of professional care, although the extent of TTE's breaches [is] not fully known to [WMP].

14. Because of TTE's various alleged breaches of its professional standard of care owed to [WMP], [WMP] has been exposed to potential liability for damages to the Library in an amount equal to the damage resulting from TTE's various breaches of its statutory, contractual and common-law standards of professional care.

Paragraph 309 of the contentions filed by [the Library] as Successor in Interest allege that "[a]s a direct and proximate result of TTE's breaches of duties owed to WMP, the Library and WMP suffered substantial damages." Paragraph 310 of the contentions . . . goes on to allege "TTE's breaches of duties of care caused WMP to breach some of WMP's duties to the Library, and TTE is liable to the Library for the damages caused by such breaches as assignee of WMP's claims against TTE."

Reviewing all of these allegations, although titled "breach of professional standard of care," it is clear that this is truly in substance a claim for indemnity. Because WMP will never incur a loss for which to be indemnified, [the Library] cannot recover under this indemnity theory packaged as "breach of professional standard of care" in Count I. Therefore, TTE is entitled to summary judgment on Count I of WMP's [cross-claim].

It is therefore ORDERED, ADJUDGED & DECREED that [TTE] is GRANTED summary judgment in its favor and against [the Library] on Counts I, II and III of the Assigned [Cross–Claim] of [WMP].

Appellant's App. at 126–30. The trial court made its order final and appealable on May 29, 2009. This appeal ensued.

### Discussion and Decision

Our standard of review in summary judgment cases is well settled:

On appeal from the grant or denial of a motion for summary judgment, our standard of review is the same as that of the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). A party seeking summary judgment bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the nonmoving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. Neither the trial court nor the reviewing court may look beyond the evidence specifically designated to the trial court. The court must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmovant, and resolve all doubts against the moving party. On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity. A party appealing from an order granting summary judgment has the burden of persuading us that the decision was erroneous.

We also note that specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. Rather, a grant of summary judgment may be affirmed upon any theory supported by the designated evidence.

*Pinkowski v. Calumet Twp. of Lake County,* 852 N.E.2d 971, 977 (Ind.Ct.App.2006) (some citations omitted), *trans. denied* (2007).

 With respect to WMP's assignment to the Library of its cross-claims against TTE, we observe that "a contract-based chose in action [6] is considered assignable unless it is purely personal in nature, and one based in tort is assignable if it arises out of injuries to personal property." *Midtown Chiropractic v. Ill. Farm-*

---

6. "A 'chose in action' has been defined as 'a personal right not reduced into possession but recoverable by a suit at law.' Choses in action are personal property. Used in its broadest sense, the term encompasses all rights of action whether they sound in contract or in tort." *McNevin v. McNevin,* 447 N.E.2d 611, 615 (Ind.Ct.App.1983) (citations omitted), *trans. denied.*

ers Ins. Co., 847 N.E.2d 942, 944 (Ind. 2006). "The fact that the assignment was made to an adversary does not, in and of itself, prohibit assignment." *INS Investigations Bureau, Inc. v. Lee,* 709 N.E.2d 736, 741 (Ind.Ct.App.1999), *trans. denied.*

As a general rule, a valid and unqualified assignment operates to transfer to the assignee all the right, title, or interest of the assignor in or to the property or property rights that are comprehended within the terms of the assignment. Such transfer confers a complete and present right in the subject matter to the assignee. . . .

. . . . An assignment vests in the assignee all rights, remedies, and contingent benefits which are incidental to the thing assigned, except those which are personal to the assignor and for his benefit only.

*Rasp v. Hidden Valley Lake, Inc.,* 519 N.E.2d 153, 158 (Ind.Ct.App.1988) (citation omitted). "[A] valid assignment gives the assignee neither greater nor lesser rights than those held by the assignor. Unless a contrary intent is shown, the assignee stands in the shoes of the assignor." *Pettit v. Pettit,* 626 N.E.2d 444, 447 (Ind.1993) (citation omitted). We address each of the assigned cross-claims below.

### I. Common Law Indemnity

 Indemnity has been defined as "[t]he right of an injured party to claim reimbursement for its loss, damage or liability from a person who has such a duty." BLACK'S LAW DICTIONARY 784 (8th ed. 2004). A right of indemnification may arise from an express contractual obligation or a statutory obligation or may be implied at common law. *Sears, Roebuck & Co. v. Boyd,* 562 N.E.2d 458, 461 & n. 2 (Ind.Ct.App. 1990).

Indiana adheres to the general rule that in the absence of an express contractual or statutory right to indemnity, a party may bring an action for indemnification only if he is without fault. The right to indemnity may be implied at common law only in favor of one whose liability to another is solely derivative or constructive and only against one whose wrongful act has caused such liability to be imposed.

*Mullen v. Cogdell,* 643 N.E.2d 390, 400 (Ind.Ct.App.1994) (citations omitted), *trans. denied* (1995). "The obligation to indemnify does not arise until the party seeking indemnity suffers loss or damages; that is, at the time of payment of the underlying claim, payment of a judgment on the underlying claim, or payment in settlement of the underlying claim." *TLB Plastics Corp. v. Procter & Gamble Paper Prods. Co.,* 542 N.E.2d 1373, 1376 (Ind.Ct. App.1989).[7]

---

7. The Library cites *Essex Group, Inc. v. Nill,* 594 N.E.2d 503 (Ind.Ct.App.1992), for the same principle, which the *Nill* court worded as follows: "The obligation to indemnify does not arise until the party seeking indemnity suffers loss or incurs damages. This *may* occur when the party seeking indemnity 1) pays the underlying claim; 2) pays judgment on the underlying claim; or 3) tenders payment in settlement of the underlying claim." *Id.* at 507 (citing *TLB Plastics* ) (emphasis added). The Library seizes on the word "may" and cites a statutory interpretation case for the proposition that "may' is permissive and not mandatory." Appellant's Br. at

21 n. 5 (citing *Lake County Auditor v. Burks,* 802 N.E.2d 896, 899 (Ind.2004)). Thus, the Library claims, "there may be other ways to suffer loss or incur damage than those listed in *Nill* and other cases." *Id.* at 22 n. 5. The Library argues that WMP suffered a loss and made a payment by assigning its crossclaims to the Library, but it cites no indemnity-related authority to support this argument. We think that the Library reads far too much into *Nill.* Although a party that assigns its right to indemnification may give up something of value, the assignment is not equivalent to a loss or payment as to the underlying claim,

The Library contends that, as WMP's assignee, it possesses "a valid cause of action under a theory of common law indemnity." Appellant's Br. at 14. We disagree, for two reasons. First, WMP has not yet paid any damages in satisfaction of any claim or judgment against TTE.[8] At the very least, then, the common law indemnity claim is not yet ripe for adjudication.[9] *See Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind.2008) ("In contribution or indemnification cases, the damage that occurs is the incurrence of a monetary obligation that is attributable to the actions of another party. That is why, generally, parties bringing contribution and indemnification claims must wait until after the obligation to pay is incurred, for otherwise the claim would lack the essential damage element."); *Fitz v. Rust-Oleum Corp.*, 883 N.E.2d 1177, 1181 (Ind.Ct. App.2008) (noting that although Ind. Trial Rule 14 "permits a claim for indemnity to be litigated contemporaneously with the injured party's claim, the rule in no way suggests that the obligation to indemnify arises before the party seeking indemnity incurs damages."), *trans. denied; IDEM v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 (Ind.1994) ("Ripeness relates to the degree to which the defined issues in a case are based on actual facts rather than on abstract possibilities, and are capable of being adjudicated on an adequately developed record.").

Second, given the nature of the Library's claims against WMP, WMP's liability to the Library *vis-à-vis* TTE cannot be solely derivative or constructive.[10] In other words, WMP cannot be without fault. "Typically, common-law claims for indemnity arise in tort actions involving such liabilities as respondeat superior or arise in breach of warranty situations where the retailer is sued upon implied warranties which are identical to those

which is an essential prerequisite for indemnification. All that being said, we agree with the Library that the trial court erred to the extent it concluded that the common law indemnity cross-claim was barred simply because WMP's insurer paid money to the Library pursuant to the Agreement. *See Spurr v. LaSalle Constr. Co.*, 385 F.2d 322, 331 (7th Cir.1967) ("[T]he fact that the indemnitee's liability was covered by insurance does not negate the indemnitor's obligation.").

8. To the extent the Library argues that the mere entry of a judgment against WMP would damage WMP's credit and reputation, we note that the Library has failed to establish that such damages would be assignable. *Cf. Picadilly v. Raikos*, 582 N.E.2d 338, 340 (Ind. 1991) ("[T]orts for personal injuries and for wrongs done to the person, reputation, or feelings of the injured party remain unassignable.") (citation omitted), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind.2007); *Sprague v. Ca. Pac. Bankers & Ins. Ltd.*, 102 Hawai'i 189, 74 P.3d 12, 24 (2003) (reaffirming "general rule" that "damages for injury to commercial credit and reputation are personal and unassignable.").

9. By contrast, a contractual indemnity claim may lie "where there is a promise to indemnify against liability, and not merely against loss or damage[.]" *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Ind.Ct.App. 2002) (citation, quotation marks, and emphasis omitted). " 'Where the indemnity is against liability, the cause of action is complete and the [party seeking indemnity] may recover on the contract as soon as his liability has become fixed and established, even though he has sustained no actual loss or damage at the time he seeks to recover.' " *Id.* (quoting 42 C.J.S. *Indemnity* § 22 (1991)) (alteration in *Henthorne* ).

10. In Indiana, derivative liability arises pursuant to either an employer/employee relationship (respondeat superior) or a manufacturer/seller relationship. *McClish v. Niagara Mach. & Tool Works*, 266 F.Supp. 987, 989–90 (S.D.Ind.1967). Constructive liability arises when a statute or rule of law imposes a nondelegable duty on a party, rendering him liable when he is otherwise without fault. *Id.* at 990.

imposed upon the manufacturer's sale to the retailer." *Rotec v. Murray Equip., Inc.,* 626 N.E.2d 533, 536 (Ind.Ct.App. 1993). Here, however, the only claims asserted by the Library against WMP that even arguably allege derivative or constructive liability are those for breach of contract, which read in pertinent part as follows:

### COUNT ONE—BREACH OF ARCHITECT CONTRACT (DESIGN PHASE)

. . . .

89. Under the terms of the Architect Contract, WMP's responsibilities included, without limitation, work pertaining to the Schematic Design Phase, the Design Development Phase and the Construction Document Phase of the Central Library Project.

90. *WMP's obligations under the Architect Contract include, without limitation, the following:*

 a. Providing the Library protection against defects and deficiencies in the work on the Central Library Project;

 b. Providing design services, including normal structural, mechanical, and electrical engineering services;

 c. Assuming responsibility for WMP's own negligent acts and omissions; and

 d. *Assuming responsibility for the acts and omissions of WMP's subcontractors, agents, consultants, and employees.*

. . . .

92. WMP breached numerous provisions of the Architect Contract.

93. The Library has suffered and will suffer damages as a result of WMP's breaches of the Architect Contract.

94. The Library has cause to believe at least a portion of the Defects are attributable to design errors and omissions made in the design of the Parking Garage and otherwise with the professional services of WMP.

95. WMP is liable to the Library for all damages arising from or associated with the errors and omissions of WMP and other parties for which WMP is responsible.

. . . .

### COUNT TWO—BREACH OF ARCHITECT CONTRACT (CONSTRUCTION ADMINISTRATION)

. . . .

99. Under the terms of the Architect Contract, WMP's responsibilities included, without limitation, work pertaining to construction administration.

100. *WMP's obligations under the Architect Contract include, without limitation, the following:*

 a. Overseeing the progress and quality of work on the Central Library Project;

 b. Determining whether work is being performed in a manner indicating conformance with contract documents;

 c. Observing tests required by the Architect Contract;

 d. Providing the Library protection against defects and deficiencies in the work on the Central Library Project;

 e. Performing work so as to avoid conflicts, delay, or interference with work on the Central Library Project;

 f. Conducting site visits;

 g. Reporting to the Library known deviations from the contract documents;

 h. Assuming responsibility for WMP's own negligent acts and omissions;

i. *Assuming responsibility for the acts and omissions of WMP's sub-contractors, agents, consultants, and employees;* and

j. Certifying that the quality of work conforms to the contract documents.

. . . .

102. WMP breached numerous provisions of the Architect Contract.

103. The Library has suffered and will suffer damages as a result of WMP's breaches of the Architect Contract.

104. The Library has cause to believe that at least some of the Defects and damages resulting therefrom are the consequence of poor administration of applicable contracts by WMP.

105. WMP is liable to the Library for all damages arising from or associated with the errors and omissions of WMP and other parties for which WMP is responsible.

Appellant's App. at 2165–67 (emphases added).

As framed by the complaint, WMP's alleged liability to the Library *vis-à-vis* TTE is purely contractual and direct. We agree with TTE that "[j]ust because [the Library] now holds an assignment for common law indemnity, it cannot escape its own allegations and recast its claims against WMP as being solely derivative." Appellee's Br. at 27. Based on the foregoing, we affirm the trial court's grant of summary judgment in favor of TTE on the common law indemnity cross-claim.[11]

## II. Contractual Indemnity

■ As indicated above, parties may provide for indemnification by express con-

tract. *Sears,* 562 N.E.2d at 461 n. 2. The Library does not challenge the trial court's determination that "[t]here is no indemnity provision in the contract [between WMP and TTE] that runs to WMP from TTE. Without such a provision, there can be no cause of action for [express] contractual indemnity against TTE." Appellant's App. at 126. Instead, the Library faults the trial court for failing to address its argument that WMP is entitled to implied contractual indemnity, which the Library raised for the first time in its response to TTE's summary judgment motion.

According to the Library, "[i]mplied contractual indemnity is grounded on the principle that the indemnitor's agreement to perform a contract necessarily implies an obligation to perform in a proper manner and to discharge foreseeable damages resulting to the plaintiff as a result of its breach." Appellant's Br. at 39 (citing *AVCP Reg'l Housing Auth. v. R.A. Vranckaert Co.,* 47 P.3d 650, 657 (Alaska 2002)). "Therefore, where one party's breach of contract causes a second party to breach a separate contract with a third party, the breaching party is liable for the second party's liability to the third party." *Id.* (citing *Carrillo v. Jam Prods., Ltd.,* 173 Ill.App.3d 693, 123 Ill.Dec. 326, 527 N.E.2d 964, 967 (1988), *appeal denied*).

The Library asserts that Indiana recognizes the doctrine of implied contractual indemnity, citing *R.N. Thompson & Associates v. Wickes Lumber Co.,* 687 N.E.2d 617 (Ind.Ct.App.1997), *trans. denied* (1998). *See id.* at 619 ("[A] right to indemnification usually arises from an express or implied contract or statutory obligation.") (citing *Rotec,* 626 N.E.2d at 535). We disagree. *R.N. Thompson* does not refer

---

11. Given our resolution of this issue, we need not address the Library's invitation to adopt the "judgment rule," as articulated in *Econo-*

*my Fire & Casualty Co. v. Collins,* 643 N.E.2d 382 (Ind.Ct.App.1994), *trans. denied* (1995).

to implied contractual indemnity, but rather to common law indemnity for breach of an implied warranty. *See id.* ("Thompson alleges neither an actual express contractual indemnification provision nor a statutory obligation; therefore, the action will lie only where the party seeking indemnity is without actual fault but has been compelled to pay damages because of the wrongful conduct of another for which he is constructively liable. An indemnity claim may exist in breach of warranty situations where the retailer is sued upon implied warranties which are identical to those imposed upon the manufacturer's sale to him.") (citations and quotation marks omitted).[12]

■ We decline the Library's invitation to adopt the doctrine of implied contractual indemnity in this case, in which WMP and TTE—two sophisticated commercial entities—were free to include an indemnity provision in the contract that allocated the risk between them but failed to do so. We agree with TTE that adopting the doctrine would "invite havoc into not only contract cases in the construction setting but throughout the spectrum of civil cases." Appellee's Br. at 34. Consequently, we affirm the trial court's ruling on this issue.[13]

### III. Breach of Professional Standard of Care

■ Finally, as mentioned above, the trial court determined that WMP's cross-claim for breach of professional standard of care was actually a claim for indemnity and granted summary judgment for TTE on that count. The Library argues that although this cross-claim shares many similarities with the common law indemnity cross-claim, it nevertheless asserts a substantively distinct theory of recovery. We agree, for the following reasons given by the Library:

> Under both claims, WMP seeks redress for wrongs that are the fault of TTE. The substantive distinction is that in the indemnity claim, WMP seeks recovery liability to the Library, resulting from the acts and omissions of WMP's subconsultants, including TTE; whereas in the breach claim, WMP seeks recovery specifically for a breach by TTE which directly injured WMP.

Appellant's Br. at 42. It is up to a jury to determine whether TTE committed such a breach and the damages, if any, to which WMP may be entitled. Accordingly, we reverse the trial court's grant of summary judgment and remand for further proceedings on this cross-claim.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and RILEY, J., concur.

---

**12.** We agree with TTE that the phrase "implied contract" as used in *R.N. Thompson* derives from *McClish,* 266 F.Supp. 987, which was cited in *Rotec* and used the phrase in prefacing a discussion of common law indemnity for a breach of implied warranties claim.

**13.** We are unsympathetic to the Library's argument that affirming the grant of summary judgment would violate public policy by discouraging settlement. The Library could have protected itself by requiring express indemnity clauses in all contracts and ensuring that WMP possessed adequate assets and insurance for the $100 million construction project. WMP could have taken similar precautions. Moreover, the Library and WMP negotiated the Agreement at arms length and with the assistance of counsel. "[T]he general rule of freedom of contract includes the freedom to make a bad bargain." *Ind. Bell Tel. Co. v. Mygrant,* 471 N.E.2d 660, 664 (Ind.1984) (citation and quotation marks omitted).